Filed 1/24/19

CERTIFIED FOR PUBLICATION

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| DARRELL E. ISSA, | D072375 |
| Plaintiff and Appellant, | |
| v. | (Super. Ct. No. 37-2016-00039144-CU-MC-CTL) |
| DOUGLAS APPLEGATE et al., | |
| Defendants and Respondents. | |

APPEAL from a judgment of the Superior Court of San Diego County, Richard E.L. Strauss, Judge. Affirmed.

Bell, McAndrews & Hiltachk, Charles H. Bell, Jr., Paul T. Gough, Brian T. Hildreth and Terry J. Martin for Plaintiff and Appellant.

Law Offices of Donnie R. Cox and Donnie R. Cox for Defendants and Respondents.

I.

INTRODUCTION

During the course of the 2016 political campaign to represent the 49th Congressional District, challenger candidate Doug Applegate's campaign ran two

television advertisements about incumbent Darrell Issa that Issa contends were false and defamatory. Issa filed a lawsuit against Applegate, Doug Applegate for Congress, Inc., and Robert Dempsey (the respondents), alleging a cause of action for libel based on statements made in these two television advertisements.

In response to the lawsuit, the respondents filed a special motion to strike the complaint, pursuant to Code of Civil Procedure section 425.16.[1] The trial court granted the respondents' anti-SLAPP motion and entered judgment in favor of the respondents on Issa's complaint. Issa now appeals from the judgment.

In resolving this appeal, we must bear in mind the political context in which the advertisements at issue were published and the extraordinary degree of protection accorded to political speech, including political advertising, in our free society. " '[T]he constitutional guarantee [of free speech] has its fullest and most urgent application precisely to the conduct of campaigns for political office.' " (*Buckley v. Valeo* (1976) 424 U.S. 1, 15.) It is beyond dispute that "political advertisements . . . [are] the hallmark of a public forum." (*AFDI v. Suburban Mobility Auth. for Regional Transp*. (6th Cir. 2012) 698 F.3d 885, 890.) While "[i]t is abhorrent that many political campaigns are mean-spirited affairs that shower the voters with invective instead of insight[,]" in order "*to ensure the preservation of a citizen's right of free expression, we must allow wide*

---

[1] Code of Civil Procedure section 425.16 is commonly referred to as the anti-SLAPP (strategic lawsuit against public participation) statute. (*Jarrow Formulas, Inc. v. LaMarche* (2003) 31 Cal.4th 728, 732, fn. 1.)

All further statutory references are to the Penal Code unless otherwise indicated.

*latitude*." (*Beilenson v. Superior Court* (1996) 44 Cal.App.4th 944, 955 (*Beilenson*), fns. omitted, italics added.) With this understanding, we consider Issa's contentions that the television advertisements that his political opponent published were false and defamatory. We ultimately conclude that the trial court properly granted the respondents' anti-SLAPP motion because Issa cannot demonstrate that the statements about which he complains are demonstrably false statements of fact.

We affirm the judgment of the trial court.

## II.

## FACTUAL AND PROCEDURAL BACKGROUND

Issa has served in the United State House of Representatives since 2000. During the time of the relevant events in this case, Issa was seeking reelection to represent the 49th Congressional District of California in the November 2016 election. Doug Applegate was Issa's opponent, Robert Dempsey was Applegate's campaign manager, and Doug Applegate for Congress, Inc. was Applegate's principal campaign committee.

On November 7, 2016, just before the election took place and Issa prevailed, Issa sued the respondents for defamation, alleging that two television advertisements published by the respondents during the political campaign were false and defamatory. Specifically, Issa filed a complaint alleging a single cause of action for libel arising from the two separate television advertisements.[2]

---

[2] Defamation constitutes an injury to reputation; the injury may occur by means of libel or slander. (Civ. Code, § 44.)

3

In the portion of the complaint setting out the factual allegations, Issa identifies the two television advertisements that he asserts were false and defamatory.

The first advertisement about which Issa complains is a television advertisement that first aired on September 20, 2016 (the 9/20 advertisement). Issa alleges that the 9/20 advertisement was shown on broadcast and cable television stations that serve the 49th Congressional District, and was also available to view on Applegate's campaign website. Issa claims that the "main thrust" of the 9/20 advertisement "is the false allegation that Congressman Issa has profited off his eight terms in Congress." He further alleges, "[s]pecifically, . . . the 9/20 Advertisement visually depicts a copy of an article from *The New York Times* dated August 14, 2011," and is referencing an article that was published in The New York Times "entitled 'A Businessman in Congress Helps His District and Himself' " that was published on August 14, 2011 (the Article).[3]

According to Issa, "[i]nstead of including the actual headline of the Article, the 9/20 Advertisement visually depicts a fake, doctored [New York Times] headline consisting of the following words that do not appear anywhere in the Article: 'Rep. Issa Gamed the system to line his own pockets' " and also depicts a "fake sub-headline, which likewise does not appear in the Article . . . . 'Rep. Issa has secured millions of dollars in

_____

[3]  The Article makes a number of assertions regarding Issa's personal wealth, his businesses and real property holdings, and actions he took as a Congressman that appear to have benefitted his businesses and properties. The Article also describes the fact that Issa's personal wealth increased during his time serving in Congress. We describe additional details about the statements made in the Article, as relevant to the issues in this case, later in this opinion.

4

Congress earmarks for roadwork to the many properties he owns.' "[4]  Issa further complains that later in the 9/20 advertisement, words "to the effect that Congressman Issa has 'steer[ed] millions in taxpayer money to help properties he owns' " are visually depicted and are also heard in a voiceover.  Issa alleges that by formatting the visual images in the 9/20 advertisement in this particular way, including by "juxtaposing an image . . . that purport[s] to represent the Article[ ] with the statements identified . . . above, the 9/20 Advertisement falsely and misleadingly leads viewers to believe that [certain] statements [presented on the screen] are quoted from an article in *The New York Times*," even though the "words in quotation marks featured in the 9/20 Advertisement do not appear anywhere in the Article."[5]

---

[4]    A review of the 9/20 advertisement shows a series of images with a narrator's voiceover.  With respect to the portions of the 9/20 advertisement about which Issa is complaining, at one point, there is an image on the screen depicting what appear to be columns of a newspaper article.  A review of the text demonstrates that the text is nonsensical.  Inset into the faux newspaper columns are the two statements that Issa takes issue with, set in type font and with formatting that one could reasonably interpret as being a newspaper headline and subheadline stating the following:  "Rep. Issa Gamed the system to line his own pockets" and "Rep. Issa has secured millions of dollars in Congress earmarks for roadwork to the many properties he owns."  At the bottom of the image, overlaying some of the faux article text, is an image of The New York Times masthead.  A still image of this portion of the 9/20 advertisement is attached as Exhibit A at the end of this opinion.

[5]    Issa also alleges that the 9/20 advertisement's "attempted reproduction of the Article itself constitutes a publication of false material" because "the Article contains numerous falsities reported as fact in supporting the false premise that Congressman Issa has obtained personal financial benefits through his activities as [a] member of the House of Representatives and generally painting Congressman Issa in a false light."  He identifies three specific errors in the original publication of the Article, and contends that there were others, but does not identify them; however, Issa also acknowledges that The New York Times published corrections pertaining to these three errors.  Although Issa

5

The second advertisement about which Issa complains is a television advertisement that first aired on October 4, 2016 (the 10/4 advertisement). According to the allegations of the complaint, "[t]he 10/4 Advertisement uses images of the terrorist attacks of September 11, 2011, and misleading statements about Congressman Issa's voting record, and a doctored quote to wage the dishonest charge that Congressman Issa has opposed supporting the victims, first responders, and heroes of September 11th."

Issa alleges that the 10/4 advertisement "used a doctored quote in an effort to smear Congressman Issa's reputation" by suggesting that Issa had said that " 'he'd done enough for something that was "simply a plane crash." ' " Issa quotes the actual comments that he made, which appear in the Congressional Record, regarding his vote against the bill referenced in the 10/4 advertisement. According to the complaint, Issa's actual comments regarding the vote in question included the following:

> "Mr. Issa: Okay. Because, well, my question from the dais is purely a Federal one. We voted in the wake of 9/11 huge amounts of money to the city and the state of New York. We have spent, arguably, between $1-$2 trillion related to the post-9/11, if you include going to Afghanistan and so on.
>
> "I have to ask why damages from a fire that had no dirty bomb in it-- it had no chemical munitions in it, *it simply was an aircraft*, residue of two aircraft, and residue of the materials used to build this

suggests that the 9/20 advertisement is false, in part because it relies on erroneous matter that was initially published in the Article, Issa has apparently abandoned the contention that the "attempted reproduction of the Article, itself, constitutes publication of false material"; he does not make any argument in this regard in his briefing on appeal. Given that a visual review of the 9/20 advertisement demonstrates that it does not actually reproduce any portion of the Article, we do not focus our attention on these allegations of the complaint, except to the extent that they bear on Issa's contention that certain statements in the 9/20 advertisement are false because they rely on the uncorrected version of the Article.

6

building--why the firefighters who went there and everyone in the
City of New York needs to come to the Federal Government for the
dollars versus, quite frankly, this being primarily a State
consideration.

"You know, it is very simple: I can't vote for additional money for
New York if I can't see why it would be appropriate to do this every
single time a similar situation happens, which quite frankly includes
any urban terrorist. It doesn't have to be somebody from Al Qaida.
It can be somebody who decides that they don't like animal testing at
one of our pharmaceutical facilities." (Italics added.)[6]

Issa further alleges that the 10/4 advertisement was "additionally false and

misleading in that it fails to mention Congressman Issa's strong record of leadership on

national security and supporting the victims, families, and first responders of 9/11."[7]

In the cause of action for libel, Issa states:

"The statements in the 9/20 and 10/4 Advertisements concerning
Congressman Issa, reproduced above, are false and libelous and
purport to state facts about the Congressman which are false. (*Baker
v. Los Angeles Herald Examiner* (1986) 42 Cal.3d 254, 261–263

---

[6]    Issa does not summarize what he believes those three paragraphs state, nor does he
identify how they are materially different from the summary of his comments provided in
the 10/4 advertisement.

[7]    Although Issa appears to be asserting in his complaint that the respondents had
some *obligation* to mention Issa's otherwise "strong record of leadership on national
security and supporting the victims, families, and first responders of 9/11" in the 10/4
advertisement, he does not develop this argument on appeal. Rather, Issa instead appears
to rely on this assertion in his complaint and evidence regarding his voting record to
support his assertion on appeal that his voting record "is just the opposite of what was
stated in the 10/4 advertisement," i.e., to bolster his argument that the message conveyed
in the 10/4 advertisement is false. In any event, there is no authority to support the
contention that a political candidate's advertisement may be considered to be defamatory
if it does not present a balanced view of his opponent. It is beyond dispute that a political
candidate is free to engage in political speech that focuses on a single act, vote or
comment by the opponent, without reference to that opponent's entire record on a
particular issue, and that casts the opponent in an unflattering light.

['The sine qua non of recovery for defamation . . . is the existence of a falsehood']; see also *Wong v. Jing* (2010) 189 Cal.App.4th 1354, 1369 ['The elements of a defamation claim are (1) a publication that is (2) false, (3) defamatory, (4) unprivileged, and (5) has a natural tendency to injure or causes special damage']."

Issa alleges in subsequent paragraphs that the advertisements refer to him, concern him, were maliciously and intentionally published by the respondents and made with actual knowledge of their falsity or reckless disregard for their truth or falsity, are libelous on their face, and have adversely affected Issa's reputation and professional life.

Just over two months after Issa filed his complaint, the respondents filed a special motion to strike the complaint, asserting that the allegations of the complaint arose from protected activities and that Issa could not establish a probability of prevailing on his claims.

After full briefing and a hearing on the matter, the trial court granted the motion, concluding that the allegations of the complaint arose from protected activities and that Issa had not demonstrated a probability of prevailing on his claim for defamation because he could not show that the alleged defamatory statements were false, and could not demonstrate that the statements were made with actual malice—i.e., that the statement were made with the knowledge that they were false or with reckless disregard as to whether they were false.

Issa filed a timely notice of appeal.

In June 2018, during the pendency of this appeal, Issa and defendant Dempsey stipulated to the dismissal of the appeal with respect to respondent Dempsey. This court dismissed the appeal as to Dempsey on June 16, 2018.

8

III.

DISCUSSION

On appeal, Issa contends that the trial court erred in granting the respondents' anti-SLAPP motion. According to Issa, he demonstrated a probability of prevailing on his defamation claims, in that he presented evidence of the falsity of the advertisements as well as the fact that the respondents acted with malice in publishing the false statements. Specifically, Issa contends that he demonstrated that the 9/20 advertisement (1) made the false and defamatory statement that he had "[g]amed the system to line his own pockets," and also falsely implied that The New York Times had made the statement that Issa had "[g]amed the system to line his own pockets"; (2) made the false and defamatory statement "Rep. Issa has secured millions of dollars in Congress earmarks for roadwork to the many properties he owns," and falsely implied that the New York Times had made this statement, as well; and (3) made the false and defamatory statement that Issa had "steer[ed] millions in taxpayer money to help properties he owned."

A. *The anti-SLAPP statute and applicable legal standards*

A SLAPP suit is "a meritless lawsuit 'filed primarily to chill the defendant's exercise of First Amendment rights.' " (*Paul v. Friedman* (2002) 95 Cal.App.4th 853, 861, quoting *Wilcox v. Superior Court* (1994) 27 Cal.App.4th 809, 815, fn. 2.) California's anti-SLAPP statute allows a defendant to move to dismiss "certain unmeritorious claims that are brought to thwart constitutionally protected speech or petitioning activity." (*Robinzine v. Vicory* (2006) 143 Cal.App.4th 1416, 1420–1421.) The anti-SLAPP statute provides: "A cause of action against a person arising from any

9

act of that person in furtherance of the person's right of petition or free speech under the United States Constitution or the California Constitution in connection with a public issue shall be subject to a special motion to strike, unless the court determines that the plaintiff has established that there is a probability that the plaintiff will prevail on the claim." (Code Civ. Proc., § 425.16, subd. (b)(1).)

A court's consideration of an anti-SLAPP motion involves a two-pronged analysis. (*Episcopal Church Cases* (2009) 45 Cal.4th 467, 477.)  The Supreme Court has expounded on the standards to be applied in this two-pronged analysis:

> "At the first step, the moving defendant bears the burden of identifying all allegations of protected activity, and the claims for relief supported by them. . . .  If the court determines that relief is sought based on allegations arising from activity protected by the statute, the second step is reached.  There, the burden shifts to the plaintiff to demonstrate that each challenged claim based on protected activity is legally sufficient and factually substantiated. The court, without resolving evidentiary conflicts, must determine whether the plaintiff's showing, if accepted by the trier of fact, would be sufficient to sustain a favorable judgment.  If not, the claim is stricken.  Allegations of protected activity supporting the stricken claim are eliminated from the complaint, unless they also support a distinct claim on which the plaintiff has shown a probability of prevailing."  (*Baral v. Schnitt* (2016) 1 Cal.5th 376, 396 (*Baral*).)

To make a showing under the first prong, the defendant need not show that the actions it is alleged to have taken were protected as a matter of law, but need only establish a prima facie case that its alleged actions fell into one of the categories listed in section 425.16, subdivision (e).  (See *Flatley v. Mauro* (2006) 39 Cal.4th 299, 314.)  If the court finds that the defendant has made the required showing, the burden shifts to the plaintiff to demonstrate that "there is a probability that the plaintiff will prevail on the

10

claim." (§ 425.16, subd. (b)(1); see *DuPont Merck Pharmaceutical Co. v. Superior Court* (2000) 78 Cal.App.4th 562, 567–568.)

"Only a cause of action that satisfies *both* prongs of the anti-SLAPP statute—i.e., that arises from protected speech or petitioning *and* lacks even minimal merit—is a SLAPP, subject to be stricken under the statute." (*Navellier v. Sletten* (2002) 29 Cal.4th 82, 89.)

Our review of the trial court's order on an anti-SLAPP motion is de novo. (*Oasis West Realty, LLC v. Goldman* (2011) 51 Cal.4th 811, 819–820.) If the trial court's decision denying an anti-SLAPP motion is correct on any theory applicable to the case, we may affirm the order regardless of the correctness of the grounds on which the trial court reached its conclusion. (*Robles v. Chalilpoyil* (2010) 181 Cal.App.4th 566, 573.) This court considers " 'the pleadings, and supporting and opposing affidavits . . . upon which the liability or defense is based.' " (*Soukup v. Law Offices of Herbert Hafif* (2006) 39 Cal.4th 260, 269, fn. 3 (*Soukup*), quoting § 425.16, subd. (b)(2).) The court does not weigh or compare the evidence, but rather accepts as true the evidence favorable to the plaintiff while evaluating the defendant's evidence " 'only to determine if it has defeated that submitted by the plaintiff as a matter of law.' " (*Soukup*, at p. 269, fn. 3.)

B. *Application of anti-SLAPP to this case*

   1. *First prong—protected activity*

The parties agree that Issa's defamation claims arise from protected speech, and thus meet the first prong of the anti-SLAPP statute.

11

2. *Second prong—probability of prevailing*

Because the respondents have met their burden to show that the complaint alleges acts arising from protected activity, the burden shifts to Issa to make a prima facie showing of facts that, if proven, would support a judgment in his favor. (*Equilon Enterprises v. Consumer Cause, Inc*. (2002) 29 Cal.4th 53, 67.) The "burden of establishing a probability of prevailing is not high: We do not weigh credibility, nor do we evaluate the weight of the evidence. Instead, we accept as true all evidence favorable to the plaintiff and assess the defendant's evidence only to determine if it defeats the plaintiff's submission as a matter of law." (*Overstock.com, Inc. v. Gradient Analytics, Inc*. (2007) 151 Cal.App.4th 688, 699–700.)

Issa asserts claims for defamation. "The elements of a defamation claim are (1) a publication that is (2) false, (3) defamatory, (4) unprivileged, and (5) has a natural tendency to injure or causes special damage. (*Taus v. Loftus* (2007) 40 Cal.4th 683, 720.)" (*Wong v. Jing* (2010) 189 Cal.App.4th 1354, 1369.) "A statement is defamatory when it tends 'directly to injure [a person] in respect to [that person's] office, profession, trade or business, either by imputing to [the person] general disqualification in those respects which the office or other occupation peculiarly requires, or by imputing something with reference to [the person's] office, profession, trade, or business that has a natural tendency to lessen its profits.' (Civ. Code, § 46, subd. 3.)" (*McGarry v. University of San Diego* (2007) 154 Cal.App.4th 97, 112 (*McGarry*).) Issa specifically claims that the advertisements adversely affected his reputation and professional life.

Though mere opinions are generally not actionable (*Taus v. Loftus*, *supra*, 40 Cal.4th at p. 720), a statement of opinion that implies a false assertion of fact is actionable. (*McGarry*, *supra*, 154 Cal.App.4th at p. 112 [" '[s]imply couching such statements in terms of opinion does not dispel these [false, defamatory] implications' [citation] because a speaker may still imply 'a knowledge of facts which lead to the [defamatory] conclusion' "]; *Ruiz v. Harbor View Community Assn*. (2005) 134 Cal.App.4th 1456, 1471 ["An opinion . . . is actionable only ' "if it could reasonably be understood as declaring or implying actual facts capable of being proved true or false" ' "].)

The defamatory statement must specifically refer to, or be " 'of and concerning,' " the plaintiff. (*Blatty v. New York Times Co.* (1986) 42 Cal.3d 1033, 1042.) Further, "it is not the literal truth or falsity of each word or detail used in a statement which determines whether or not it is defamatory; rather, the determinative question is whether the 'gist or sting' of the statement is true or false, benign or defamatory, in substance." (*Ringler Associates Inc. v. Maryland Casualty Co*. (2000) 80 Cal.App.4th 1165, 1181–1182.)

"In determining whether a statement is libelous we look to what is explicitly stated as well as what insinuation and implication can be reasonably drawn from the communication." (*Forsher v. Bugliosi* (1980) 26 Cal.3d 792, 803.) " ' "[I]f the defendant juxtaposes [a] series of facts so as to imply a defamatory connection between them, or [otherwise] creates a defamatory implication . . . he may be held responsible for the defamatory implication, . . . even though the particular facts are correct." ' " (*Weller v. American Broadcasting Companies, Inc*. (1991) 232 Cal.App.3d 991, 1003, fn. 10.) The

13

"pertinent question" is whether a "reasonable fact finder" could conclude that the statements "as a whole, or any of its parts, directly made or sufficiently implied a false assertion of defamatory *fact* that tended to injure" plaintiff's reputation. (*James v. San Jose Mercury News, Inc*. (1993) 17 Cal.App.4th 1, 13.)

We apply a " 'totality of the circumstances' " test to determine whether a statement is fact or opinion, and whether a statement declares or implies a provably false factual assertion; that is, courts look to the words of the statement itself and the context in which the statement was made. (*Baker v. Los Angeles Herald Examiner* (1986) 42 Cal.3d 254, 260–261, 266; *Overhill Farms, Inc. v. Lopez* (2010) 190 Cal.App.4th 1248, 1261 (*Overhill Farms*); *Franklin v. Dynamic Details, Inc.* (2004) 116 Cal.App.4th 375, 385–386 (*Franklin*).) "Under the totality of the circumstances test, '[f]irst, the language of the statement is examined. For words to be defamatory, they must be understood in a defamatory sense . . . . [¶] Next, the context in which the statement was made must be considered.' " (*Franklin*, at pp. 385–386.) Whether challenged statements convey the requisite factual imputation is ordinarily a question of law for the court. (*Overhill Farms*, at p. 1261; *Nygard, Inc. v. Uusi–Kerttula* (2008) 159 Cal.App.4th 1027, 1048–1049 (*Nygard*).)

Additionally, because Issa is a public figure, if he is able to establish the falsity of the challenged statements, he must also demonstrate, by clear and convincing evidence, that the challenged statements were made with actual malice in order to prevail on his claim for defamation. (*Christian Research Institute v. Alnor* (2007) 148 Cal.App.4th 71,

14

84.)[8] " 'The rationale for . . . differential treatment [between public figures and private individuals] is, first, that the public figure has greater access to the media and therefore greater opportunity to rebut defamatory statements, and second, that those who have become public figures have done so voluntarily and therefore "invite attention and comment." ' " (*Jackson v. Mayweather* (2017) 10 Cal.App.5th 1240, 1260 (*Jackson*).)

In addition, we cannot ignore the context in which this case has arisen—Issa's complaint seeks redress for a political advertisement that was shown on television during a heated election campaign. Indeed, "[*p*]*olitical* and self expression lie at the very heart of the First Amendment." (*U.S. v. Alvarez* (9th Cir. 2011) 638 F.3d 666, 677, italics added.) For this reason, in determining the merits of an anti-SLAPP motion in the context of political advertising, we must be vigilant to afford a wide berth to the free exchange of ideas, including those that challenge or criticize statements made or actions taken by candidates seeking elected office. " '[T]hose engaged in political debate are entitled not only to speak responsibly but to ". . . speak foolishly and without moderation." (*Baumgartner v. United States* [(1944)] 322 U.S. 665, 674].)' [Citation.]" (*Beilenson*, *supra*, 44 Cal.App.4th at p. 949–950.)

> "Hyperbole, distortion, invective, and tirades are as much a part of American politics as kissing babies and distributing bumper stickers and pot holders. Political mischief has been part of the American political scene since, at least, 1800.
>
> "In any election, public calumny of candidates is all too common. 'Once an individual decides to enter the political wars, he subjects himself to this kind of treatment. . . . [D]eeply ingrained in our

---

[8] The parties agree that Issa is a public figure.

15

political history is a tradition of free-wheeling, irresponsible, bare knuckled, Pier 6, political brawls.' (*Desert Sun Publishing Co. v. Superior Court*, *supra*, 97 Cal.App.3d at p. 54.) To endure the animadversion, brickbats and skullduggery of a given campaign, a politician must be possessed with the skin of a rhinoceros. (*Hein v. Lacy* (1980) 228 Kan. 249, 263 [616 P.2d 277, 286].) Harry Truman cautioned would-be solons with sage advice about the heat in the kitchen.

"Nevertheless, political campaigns are one of the most exhilarating phenomena of our democracy. They bring out the best and the worst in us. They allow candidates and their supporters to express the most noble and, lamentably, the most vile sentiments. They can be fractious and unruly, but what they yield is invaluable: an opportunity to criticize and comment upon government and the issues of the day.

"The candidate who finds himself or herself the victim of misconduct is not without a remedy. Those campaign tactics which go beyond the pale are sanctionable under FPPC laws. (Elec. Code, § 16000 et seq.; *Gooch v. Hendrix* (1993) 5 Cal.4th 266 [election set aside for illegal absentee ballots].)" (*Beilenson*, *supra*, 44 Cal.App.4th at pp. 954–955, fns omitted.)

Although, as the *Beilenson* court lamented, "many political campaigns are mean-spirited affairs that shower the voters with invective instead of insight," it nevertheless remains beyond question that in order "to ensure the preservation of a citizen's right of free expression, we must allow wide latitude." (*Beilenson*, *supra*, 44 Cal.App.4th at p. 955.)

a. *The 9/20 advertisement*

Issa argues that the 9/20 advertisement "visually depicts a fake, doctored headline consisting of the following words that do not appear anywhere in the [New York Times] Article: *Rep. Issa Gamed the system to line his own pockets*," and further complains that a "fake sub-headline, which likewise does not appear in the Article, is also depicted: *Rep.*

16

*Issa has secured millions of dollars in Congress earmarks for roadwork to the many properties he owns*."  He asserts that "[b]y juxtaposing an image of the Article (or at least images that purport to represent the Article) with the statements identified above, the 9/20 Advertisement falsely and misleadingly led viewers to believe that the statements are actual quotes from The New York Times."  He further asserts that "the 9/20 Advertisement [draws on the Article to] falsely accuse[ ] Issa [of ]'steering millions in taxpayer money to help properties he owned.' "

i. *The statement "Issa Gamed the system to line his own pockets"*

We begin with Issa's contention regarding the statement that he " '[g]amed the system to line his own pockets.' "  It appears from Issa's briefing that he is contending both that the statement that he "[g]amed the system to line his own pockets" is provably false, and also that the 9/20 advertisement implies that The New York Times stated that "Issa [g]amed the system to line his own pockets," and that this implication is also false. " 'The falsehood requirement is grounded in the First Amendment itself.  "Under the First Amendment there is no such thing as a false idea.  However pernicious an opinion may seem, we depend for its correction not on the conscience of judges and juries but on the competition of other ideas." [Citations.]' "  (*Nygard*, *supra*, 159 Cal.App.4th at p. 1048.) " 'Though mere opinions are generally not actionable [citation], *a statement of opinion that implies a false assertion of fact is . . . .*' [Citations.]  Thus, the 'inquiry is not merely whether the statements are fact or opinion, but " 'whether a reasonable fact finder could conclude the published statement declares or implies a provably false assertion of fact.' " ' "  (*Jackson*, *supra*, 10 Cal.App.5th at p. 1261.)

17

We conclude that the statement that "Issa [g]amed the system to line his own pockets" is not provably false. Specifically, the statement appears to be a fair summary of the gist of the Article from The New York Times, albeit one that is packaged in the type of " ' " 'rhetorical hyperbole,' 'vigorous epithet[s],' 'lusty and imaginative expression[s] of . . . contempt,' and language used 'in a loose, figurative sense' " ' " (*Nygard*, *supra*, 159 Cal.App.4th at p. 1048) that is accorded constitutional protection; Issa has not challenged the basic premise of the Article published by The New York Times nor has he demonstrated, apart from three minor corrections that the New York Times published with respect to the Article, that the corrected Article contains falsehoods.[9] The title of the Article that forms the main basis of the claims made in the 9/20 advertisement is "A Businessman in Congress Helps His District and Himself." The Article comments that although "[m]ost wealthy members of Congress push their financial activities to the side, with many even placing them in blind trusts to avoid

---

[9]    Issa has complained that the Article, as originally published, included at least three factual errors. He acknowledges, however, that The New York Times published corrections regarding those items. There is no evidence that Issa ever challenged any other factual assertions in the Article, and the record demonstrates that The New York Times did not retract the Article, and did not alter any other statements or conclusions in the Article.

    Further, it is clear from a review of those corrections that they do not in any way alter the main thrust of the Article. The three corrections published by The New York Times identified misstatements about the value of a holding company split, the sale of an AIM mutual fund, and the purchase price for a medical office plaza. Issa sought no other corrections to the Article, and these three corrections do not materially change the essence of the Article, which is that while Issa was serving in Congress, he voted on matters that could benefit him financially, and that his businesses holdings, his personal wealth and his business and real property portfolio increased during his time in Congress.

18

appearances of conflicts of interest," Issa "may be alone in the hands-on role he has played in overseeing a remarkable array of outside business interests since his election in 2000." The Article also notes that during his time in Congress, Issa has "bought up office buildings, split a holding company into separate multi-million dollar businesses, started an insurance company, traded hundreds of millions of dollars in securities, invested in overseas funds, retained an interest in his auto-alarm company and built up a family foundation." According to the Article, "it is sometimes difficult to separate the business of Congress from the business of Darrell Issa." In this regard, the Article states that as Issa's "private wealth and public power have grown, so too has the overlap between his private and business lives, with at least some of the congressman's government actions helping to make a rich man even richer." In addition, the Article states that, according to Issa's financial filings, his "minimum wealth doubled in the last year, and he appears flush with cash."

In view of the content of the Article, a charge by Applegate, Issa's political opponent, that Issa has used his position in Congress to improve his own financial standing, is well within the range of fair commentary—which includes "[h]yperbole, distortion, invective, and tirades" (*Beilenson*, *supra*, 44 Cal.App.4th at p. 954)—that is permissible with respect to a political rival. Further, to the extent that this descriptive statement implies a certain factual assertion about Issa—i.e., that he has utilized his position in Congress to benefit himself—such a factual assertion is supported by the factual statements and conclusions drawn in the corrected version of the Article, the truth of which Issa has not challenged.

19

However, Issa's complaint is not simply that *Applegate*, his political opponent, made these statements about him in the 9/20 advertisement, but rather, that the 9/20 advertisement, through its formatting and pictorial representation, implies that The New York Times made the statement, "Issa [g]amed the system to line his own pockets," and that the 9/20 advertisement suggests that Applegate and his campaign are merely sharing with viewers of the advertisement what The New York Times said. According to Issa, "The joining of The New York Times masthead with fabricated quotes conveys a publication by The New York Times that never occurred -- in other words, it's a lie." Issa argues that "the mere omission of a set of quotation marks in a video presentation cannot cure the otherwise misleading statements paired in the same frame as The New York Times masthead," and that he therefore met his burden of proof to demonstrate that the 9/20 advertisement was "at least defamatory by implication."

In a case in which a plaintiff seeks to maintain an action for defamation by implication, the plaintiff must demonstrate that (1) his or her interpretation of the statement is reasonable; (2) the implication or implications to be drawn convey defamatory facts, not opinions; (3) the challenged implications are *not* " 'substantially true' "; and (4) the identified reasonable implications could also be reasonably deemed defamatory. (*Heller v. NBCUniversal, Inc*. (C.D. Cal., June 29, 2016) 2016 U.S. District LEXIS 193316, *9–10.) Thus, "a plaintiff may not construct an actionable statement by reading whatever implication it wishes into the defendants' words" (*Metabolife Int'l v. Wornick* (9th Cir. 2001) 264 F.3d 832, 839), and the implications drawn from the statement must convey facts, not opinions: "[I]n reviewing a defamation claim, a court

must ask as a threshold matter whether a reasonable factfinder could conclude that the contested statement implies an assertion of objective fact. If the answer is no, the claim is foreclosed by the First Amendment." (*Partington v. Bugliosi* (9th Cir. 1995) 56 F.3d 1147, 1153, internal quotation marks omitted.) Further, a plaintiff must show that the identified implications could be reasonably deemed defamatory—i.e., that it injures or disparages the victim's reputation. (*Gilbert v. Sykes* (2007) 147 Cal.App.4th 13, 27, [" 'Defamation is an invasion of the interest in reputation' "]; *Truck Ins. Exchange v. Bennett* (1997) 53 Cal.App.4th 75, 85 ["[D]efamation invades the interest in personal or professional reputation and good name"].)

Most significant here is the requirement that the challenged implications of fact *must not be "substantially true."* (*Summit Bank v. Rogers* (2012) 206 Cal.App.4th 669, 697, italics added.) "[T]he law does not require [the defendant] to justify the literal truth of every word of the allegedly defamatory content. . . . 'It is sufficient if the defendant proves true the *substance* of the charge, irrespective of slight inaccuracy in the details, "so long as the imputation is substantially true so as to justify the 'gist or sting' of the remark." ' " (*Ibid.*) Thus, "the statement is not considered false unless it 'would have a different effect on the mind of the reader from that which the pleaded truth would have produced.' " (*Masson v. New Yorker Magazine, Inc.* (1991) 501 U.S. 496, 516–517 (*Masson*).)

The United States Supreme court in *Masson* explained the common law principle that inaccuracies alone do not render a statement false if there remains "substantial truth" to what was said. (*Masson, supra*, 501 U.S. 496, 516.) The United States Supreme Court

21

concluded that, *even when dealing with quotations*, a minor alteration of the words does not make the quotation "false" unless the alteration changes the meaning in a material way. (*Id.* at p. 517.) In fact, even "deliberate alteration of the words uttered by a plaintiff does not equate with knowledge of falsity . . . unless the alteration results in *a material change in the meaning conveyed by the statement*." (*Ibid.*, italics added.)

In applying these principles to Issa's contention that the 9/20 advertisement suggested to viewers that The New York Times made the statement "Issa [g]amed the system to line his own pockets," it is clear that the 9/20 advertisement did not actually state that The New York Times made the challenged statements, nor did it use quotation marks around the statement, which would indicate to a viewer that the statements were in fact made by The New York Times. Rather, the 9/20 advertisement could be understood to *imply*, through font style, formatting and the visual juxtaposition of the statements at issue with The New York Times masthead placed over something made to look like a newspaper article, that it was presenting a statement from an article published by The New York Times. We must therefore determine whether the statement reasonably implied by the 9/20 advertisement—i.e., that *The New York Times said* that Issa has "[g]amed the system to line his own pockets"—is substantially true, even though both parties agree that these particular words did not appear in the Article.

We conclude that the implied statement is substantially true, in that The New York Times said something substantially similar to what the 9/20 advertisement implies it said. As we have already indicated, the Article was titled "A Businessman in Congress Helps His District and Himself," and begins by indicating that Issa had chosen not to avoid the

22

appearance of conflicts of interest, as most of his Congressional colleagues had done, and instead appeared to be "alone in the hands-on role he has played in overseeing a remarkable array of outside business interests since his election in 2000." The Article specifically states that as Issa's "private wealth and public power have grown, so too has the overlap between his private and business lives, with *at least some of the congressman's government action helping to make a rich man even richer*." (Italics added.) In addition, the Article states that, according to Issa's financial filings, his "minimum wealth doubled in the last year, and he appears flush with cash." A political opponent could fairly summarize the statements made by The New York Times as saying that Issa has used his position in Washington to increase his wealth — i.e., that he has "gamed" the system of government in such a way as to "line" his pockets with additional wealth.

The " 'substance, the gist, the sting' " (*Masson*, *supra*, 501 U.S. at p. 517) of the 9/20 advertisement— that Issa "gamed" the system to "line his own pockets," constitutes a fair, if sharply worded, summary of the content of the Article published by the New York Times. A political challenger must be afforded leeway to characterize the conduct of his opponent, even if such characterization takes the most negative perspective, in order to ensure "uninhibited, robust, and wide-open" debate on public issues (*New York Times, Co. v.* Sullivan (1964) 376 U.S. 254, 270). Again, "[h]yperbole, distortion, invective, and tirades" are "a part of American politics," and while providing protection for such speech may allow "candidates and their supporters to express . . . the most vile sentiments," it is nevertheless necessary in order to ensure the "opportunity to criticize

23

and comment upon government and the issues of the day." (*Beilenson*, *supra*, 44 Cal.App.4th at pp. 954–955.)

> ii. *The statement "Rep. Issa has secured millions of dollars in Congress earmarks for roadwork to the many properties he owns"*

We next address Issa's complaint that the statement in the 9/20 advertisement that "Rep. Issa has secured millions of dollars in Congress earmarks for roadwork to the many properties he owns" is false. Issa's argument with respect to this statement is somewhat ambiguous. He appears to contend that the statement "Rep. Issa has secured millions of dollars in Congress earmarks for roadwork to the many properties he owns" is itself a provably false statement of fact, and also that the 9/20 advertisement falsely implies that The New York Times made this statement in the Article.

With respect to the contention that the statement "Rep. Issa has secured millions of dollars in Congress earmarks for roadwork to the many properties he owns," we conclude that this statement is not provably false. There is support for such a statement in the Article on which the 9/20 advertisement is based. Indeed, the entire thrust of the Article is that Issa has voted in favor of earmarks for infrastructure projects located within five miles of numerous properties that he owns. The Article expressly states that "[Issa] has secured millions of dollars in Congressional earmarks for road work and public works projects that promise improved traffic and other benefits to the many commercial

24

properties he owns here north of San Diego." Thus, based on the evidence provided in the Article, it is clear that the challenged statement is substantially true.[10]

With respect to any argument that the "statement" that Issa is challenging is the implied assertion that *The New York Times said* that "Rep. Issa has secured millions of dollars in Congress earmarks for roadwork to the many properties he owns," we also conclude that falsity cannot be established because such an assertion is also "substantially" true.

In the 9/20 advertisement, the words "Rep. Issa has secured millions of dollars in Congress earmarks for roadwork to the many properties he owns" are visually depicted under the statement "Issa Gamed the system to line his own pockets" in such a way as to appear as if the statement could be a sub-headline to the Article. Like the statement about Issa "[g]am[ing] the system," the parties agree that the Article does not include the words "Rep. Issa has secured millions of dollars in Congress earmarks for roadwork to the many properties he owns," verbatim, either as a headline or in the text of the Article.

However, as noted, we look to determine whether " 'the substance, the gist, the sting, of the libelous charge [can] be justified.' " (*Masson*, *supra*, 501 U.S. at p. 517.) Although the Article did not expressly state, "Rep. Issa has secured millions of dollars in Congress earmarks for roadwork to the many properties he owns," if what the Article did say about Issa is not materially different from the statement that the 9/20 advertisement

---

10    Again, other than the three minor factual corrections Issa sought from The New York Times mentioned above, Issa has not otherwise challenged the factual assertions in the Article.

implies, then Issa cannot demonstrate that the alleged implied quotation was "false" for purposes of establishing a defamation claim. A review of the Article demonstrates that the substance or gist of the Article supports the implied factual assertion, such that the implied factual assertion rings "substantially true."

The Article stated that "[Issa] has secured millions of dollars in Congressional earmarks for road work and public works projects that promise improved traffic and other benefits to the many commercial properties he owns here north of San Diego." Elsewhere, the Article explains: "The hard-hit San Diego area has also benefited from federal money Mr. Issa brought through earmarks, which allow lawmakers to award money for their own pet projects. Indeed, more than two dozen of Mr. Issa's properties are within five miles of projects he has personally earmarked for road work, sanitation, and other improvements . . . ." Although the Article did not use the specific words "Rep. Issa has secured millions of dollars in Congress earmarks for roadwork to the many properties he owns," the essence of a number of statements in the Article is that Issa earmarked millions of dollars for road improvement projects that benefit, either directly or indirectly, properties that he owns. Thus, the implied suggestion that the Article made the statement "Rep. Issa has secured millions of dollars in Congress earmarks for roadwork to the many properties he owns" fairly summarizes the " ' substance, the gist, [and] the sting' " (*Masson*, s*upra*, 501 U.S. at p. 517) of the charge against Issa made by The New York Times in the Article.

26

### iii. *The statement that Issa "steered millions in taxpayer money to help properties he owned"*

Issa further contends that the 9/20 advertisement falsely claims that he "steer[ed] millions of dollars in taxpayer money to help his own properties." (Boldface and some capitalization omitted.) He asserts that this statement is predicated on the Article, and that the Article erred in alleging that Issa's "property at 2067 West Vista Way appreciated 60% after Issa secured 'the first of two earmarks for the two mile project.' " According to Issa, "[t]his entire narrative [regarding the West Vista Way property] is false."

With respect to this statement, Issa does not separately argue on appeal that the statement falsely suggests that it is a specific headline or quotation from Article itself, as he does with respect to the previous statements. Instead, he appears to be arguing that this statement is simply false, on its own—i.e., that he did not, as a matter of fact, " 'steer[ ] millions in taxpayer money to help properties he owned.' "[11] In support of this contention, Issa offers evidence that certain claims in the Article regarding a particular property referenced in the article, the 2067 West Vista Way property, were not true, and that because those claims were not true, the 9/20 advertisement's statements based on that claim are also not true.[12]

---

[11] Although in the complaint Issa alleges that the words in this statement also "do not appear anywhere in the Article," Issa does not appear to contend on appeal that the 9/20 advertisement falsely implies that The New York Times made this statement.

[12] For example, Issa asserts that The New York Times printed a correction to its original article, stating that Issa had paid more for the property than the Article stated, and thus, that the property had not appreciated 60% in value, as the original version of the Article had suggested.

As the trial court noted, Issa appears to premise his challenge to the truth of the statement on facts in the Article that relate to a single property he owns—a building located at 2067 West Vista Way.  However, the Article used that particular property as an *exemplar* of the type of properties that Issa owns and the type of earmarks on which he has voted that would benefit his properties.  The Article did not rely solely on Issa's vote concerning one particular road widening project that could benefit the West Vista Way property; rather, the Article referenced a number of properties that Issa owns that are within five miles of infrastructure projects that he voted to fund.  As we have already noted, the Article expressly states that Issa "has secured millions of dollars in Congressional earmarks for road work and public works projects that promise improved traffic and other benefits *to the many commercial properties he owns here north of San Diego*."  (Italics added.)  An analysis conducted by The New York times demonstrated that "*more than two dozen of Mr. Issa's properties* are within five miles of projects *he has personally earmarked* for road work, sanitation and other improvements."  Clearly, the Article was not relying solely on earmarks regarding the West Vista Way project for its contentions regarding Issa's support of funding for infrastructure projects that would benefit his properties.  The fact that The New York Times's published corrections regarding certain facts about the purchase price of the West Vista Way property vis-à-vis the value of the property at the time of the Article's publication does not demonstrate that the statement in the 9/20 advertisement regarding Issa "steering millions in taxpayer money to help properties he owned" is not substantially true.

Issa has failed to make a prima facie showing of the falsity of the 9/20 advertisement. He therefore cannot demonstrate a probability of prevailing on his defamation claims regarding the 9/20 advertisement.

b. *The 10/4 advertisement*

Issa contends that the 10/4 advertisement "uses misleading statements about Issa's voting record, and a doctored quote in support of the false claim that Issa has opposed supporting the victims, first responders, and heroes of the September 11, 2001 attack." The 10/4 advertisement questions Issa's voting record regarding using additional federal funds, beyond what had already been appropriated, to pay for healthcare for first responders to the 9/11 attacks. As Issa complains, the narrator of the 10/4 advertisement says at one point, "Issa said he'd done enough for something that was simply a plane crash." However, as Issa points out, he "never said that he 'had done enough for something that was simply a plane crash.' " He argues that with respect to his comments on which the 10/4 advertisement relies, the Congressional Record demonstrates that what he said was qualitatively different:

> "Mr. Issa: Okay. Because, well, my question from the dais is purely a Federal one. We voted in the wake of 9/11 huge amounts of money to the city and the state of New York. We have spent, arguably, between $1-$2 trillion related to the post-9/11, if you include going to Afghanistan and so on.
>
> "I have to ask why damages from a fire that had no dirty bomb in it-- it had no chemical munitions in it, *it simply was an aircraft*, residue of two aircraft, and residue of the materials used to build this building--why the firefighters who went there and everyone in the City of New York needs to come to the Federal Government for the dollars, versus, quite frankly, this being primarily a State consideration.

29

"You know, it is very simple:  I can't vote for additional money for New York if I can't see why it would be appropriate to do this every single time a similar situation happens, which quite frankly includes any urban terrorist.  It doesn't have to be somebody from Al Qaida.  It can be somebody who decides that they don't like animal testing at one of our pharmaceutical facilities."  (Italics added.)

Issa contends that the "difference between an 'aircraft' and a 'plane' crash is substantial."  According to Issa, the difference is "between whether a member of Congress questioned whether federal or state funds should be used for 9/11 first responders or whether that member of Congress minimized and belittled the 9/11 tragedy."  Issa argues that the " 'gist' " of his statement in Congress was that he questioned whether the federal government should provide further funding for the health care costs of 9/11 victims and first responders, but that the " 'gist' of the 10/4 Advertisement is that Issa called the 9/11 attack simply a plane crash and rejected the request for help by the victims and first responders."

Issa's summary of the 10/4 advertisement fails to consider the full context of the 10/4 advertisement in which the statement is placed.

In examining whether a statement is false and defamatory, we look to the totality of the circumstances, which includes not only the words of the identified defamatory statement, but the context in which the statement was made.  (*Overhill Farms*, *supra*, 190 Cal.App.4th at p. 1261.)  "[A] defamatory meaning must be found, if at all, in a reading of the publication as a whole."  *(Kaelin v. Globe Communications Corp.* (9th Cir. 1998) 162 F.3d 1036, 1040.)  "Defamation actions cannot be based on snippets taken out of context."  (*Ibid.*)

In the 10/4 advertisement, a voiceover narrator, who is identified as a "9/11 First Responder," says, ". . . Darrell Issa and the Tea Party Republicans tried to play politics with our lives. The Tea Party Republicans actually voted to deny healthcare to 9/11 first responders."[13] The 10/4 advertisement then shows, in quotation marks, the statement, " 'Simply a plane crash' " underneath the masthead of the New York Daily News and the date April 3, 2008. While this image is on the screen, the narrator says, "Issa said he'd done enough for something that was simply a plane crash." The narrator then says, "Darrell Issa and the Tea Party Republicans turned their backs on all of us."

Issa complains that it is "undisputed that Congressman Issa never said that he'd done enough for something that was simply a plane crash." That assertion appears to be correct. The respondents note that the phrase "simply a plane crash" was a direct quotation from a Daily News article published April 3, 2008, in which the *Daily News* summarized Issa's remarks as conveying the message that he had done enough for something that was " '[s]imply a plane crash.' " We agree with the respondents that the visual depiction of the words " 'simply a plane crash,' " in quotation marks, could be understood as depicting a statement made by the Daily News. However, the narrator of the 10/4 advertisement also states "Issa said he'd done enough for something that was simply a plane crash," arguably attributing to Issa the statement that 9/11 was "simply a plane crash." In doing so, the 10/4 advertisement could be viewed as misquoting the

---

13    Issa does not contend in briefing on appeal that this portion of the 10/4 advertisement is false.

31

words that Issa actually said on the House floor to the effect that the 9/11 events involved "simply . . . an aircraft."  However, "[i]f an author alters a speaker's words but effects no material change in meaning, including any meaning conveyed by the manner or fact of expression, the speaker suffers no injury to reputation that is compensable as a defamation."  (*Masson*, *supra*, 501 U.S. at p. 516.)  Considered in the context in which the statement was made, we cannot conclude that the suggestion that Issa uttered the words " 'simply a plane crash' " conveys a meaning that is materially different from the actual words he uttered, which included the comment that the 9/11 damages were caused by something that "simply was an aircraft."

We disagree with Issa's contention that the attribution to Issa of the entire statement—i.e., that he had "done enough for something that was simply a plane crash"—materially altered the gist of the comments that Issa made on the House floor.  If one considered the narrator of the 10/4 advertisement to be stating his own personal understanding of what Issa said on the House floor, rather than suggesting that he was repeating verbatim what Issa had stated during his Congressional remarks, it would be clear that the narrator's summary is a fair summary of Issa's comments.  Indeed, the New York Daily News article discussing Issa's remarks summarized those remarks in precisely this way.  Further, we cannot take the words "Issa said he'd done enough for something that was simply a plane crash" out of the context of the entire advertisement, which Issa acknowledges.  Nevertheless, Issa contends that the " 'gist' " of the 10/4 advertisement is that he "called the 9/11 attack simply a plane crash and rejected the request for help by the victims and first responders."  However, the charge of the 10/4 advertisement was

32

that Issa, together with other members of Congress, voted not to provide further federal funds for health care for 9/11 first responders, and that Issa's reason for this was that the federal government had, essentially, done enough with respect to paying for health care for these individuals.

The 10/4 advertisement based this charge on comments that Issa made on the House floor, in which Issa raised the fact that Congress had previously voted to provide "huge amounts of money" to New York City and the state of New York, and that "[w]e have spent, arguably, between $1-$2 trillion related to . . . post-9/11." Issa then said, "I have to ask why damages from a fire that had no dirty bomb in it--it had no chemical munitions in it, it simply was an aircraft, residue of two aircraft, and residue of the materials used to build this building--why firefighters who went there and everyone in the City of New York needs to come to the Federal Government for the dollars versus . . . this being primarily a State consideration." Issa also compared the 9/11 attack to other theoretical urban terrorist attacks, suggesting that it was no different from any other urban terrorist attack. Thus, the "gist" of Issa's comments was that the federal government had already paid a sufficient amount for health care for first responders for 9/11 because the wreckage did not require clean-up from a chemical weapon or dirty bomb; rather, the wreckage was, in Issa's estimation, not as complex to clean up as it would be in those situations, given that it involved only downed aircraft and buildings.

Given the political context in which the statements in the 10/4 advertisement were made, even if Issa did not say the words, "[I have] done enough for something that [is] simply an airplane crash," his comments on the House floor could be fairly summarized

33

in this manner. A political opponent must be afforded sufficient latitude to summarize his political adversary's comments in an unflattering light, in order to "ensure the preservation of a citizen's right of free expression." (*Beilenson*, *supra*, 44 Cal.App.4th at p. 955.) Given the latitude that must be afforded political speech, including the protection afforded to "[h]yperbole, distortion, invective, and tirades" (*id.* at p. 954), we conclude that Issa has not shown that the statement at issue so distorts what he actually said as to render it provably false. Issa therefore cannot demonstrate a probability of prevailing on his defamation claim regarding the 10/4 advertisement.

C. *Evidentiary issues*

Issa separately contends that the trial court erred in overruling his evidentiary objections to the declarations submitted by Applegate and his campaign manager, Robert Dempsey, and the supplemental declarations submitted by the two men.[14] He also challenges the trial court's sustaining of the respondents' objection to a single sentence in the declaration of Gilliard, Issa's expert.

As Issa acknowledges, the Applegate and Dempsey declarations were submitted to demonstrate that Issa could not show a probability of prevailing on the element of "malice." Similarly, the sentence from the Gilliard declaration that Issa asserts the court should have considered was submitted as evidence that the respondents had acted with

---

14    Issa objected to the initial declarations filed by Applegate and Dempsey. Respondents filed supplemental declarations by Applegate and Dempsey together with their reply brief on the anti-SLAPP motion. Issa objected to the supplemental declarations, as well.

malice in publishing the challenged advertisements.[15]  However, as we have already determined, the trial court appropriately ruled that Issa has failed to demonstrate a probability of prevailing on his claims against respondents because he cannot demonstrate that the statements are not *substantially* true.  As a result, we need not consider the separate question of whether the respondents acted with malice, rendering the trial court's evidentiary rulings regarding evidence submitted with respect to the question of malice not necessary to our determination of the anti-SLAPP motion.  In essence, because we conclude that we may affirm the trial court's ruling on respondents' anti-SLAPP motion on the ground that Issa cannot demonstrate a probability of prevailing on his claims for libel because he cannot demonstrate that the respondents published any provably false statements about him or that they published statements that *implied* something not substantially true concerning him, we need not consider Issa's arguments regarding the trial court's rulings with respect to the Applegate, Dempsey, and Gilliard declarations.

---

[15]     The sentence from the Gilliard declaration that the trial court struck and did not consider after sustaining the respondents' objection was " 'Applegate and Dempsey certainly ignored evidence that would have undermined the allegations of both advertisements.' "

IV.

DISPOSITION

The judgment of the trial court is affirmed.  The defendants are entitled to costs on appeal.


                                                                          AARON, J.

WE CONCUR:

HUFFMAN, Acting P. J.

NARES, J.

# Exhibit A

