Filed 2/28/23

CERTIFIED FOR PUBLICATION

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

JOSHUA BILLAUER,

     Plaintiff, Cross-defendant, and Appellant,

     v.

OLGA MARCELA ESCOBAR-ECK,

     Defendant, Cross-complainant, and Respondent.

D079835

(Super. Ct. No. 37-2021-00006367-CU-DF-CTL)

APPEAL from a judgment of the Superior Court of San Diego County, Kenneth J. Medel, Judge. Affirmed.

Briggs Law Corporation, Cory J. Briggs, and Janna M. Ferraro for Plaintiff, Cross-defendant, and Appellant.

The Cabrera Firm, Guillermo Cabrera, William Moore; Austin Legal Group, and Tamara M. Leetham for Defendant, Cross-complainant, and Respondent.

Joshua Billauer appeals an order denying his special motion to strike a cross-complaint under Code of Civil Procedure[1] section 425.16, the anti-SLAPP (strategic lawsuit against public participation) statute.  We affirm.

FACTUAL AND PROCEDUAL BACKGROUND

Olga Marcela Escobar-Eck is the President and Chief Executive Officer of Atlantis, a land use and strategic planning firm in San Diego.  Atlantis helped submit an application, on behalf of All People's Church (Church) to the City of San Diego (City) for the development of a church campus.  That application remains under review by the City and will ultimately need approval of the City Council.  The Church hired Atlantis around 2019.  Atlantis is guiding the Church through the City review and approval process.  To this end, Escobar-Eck has attended public meetings concerning the Church project and identified herself as a representative of the Church.

Billauer lives in San Diego and works for Wells Fargo.  He is a neighborhood activist.  He owns property in the Del Cerro area where the Church project is proposed.  Billauer does not favor the Church project, emphasizing the project's lack of housing despite the " 'major housing crisis' " in San Diego and speaking against it at community meetings.

Billauer controls, operates, and/or contributes content to the account "Save Del Cerro" across multiple social media accounts, specifically operating on Twitter and contributing to Instagram and Facebook accounts.  All three accounts are public; thus, all users of each of those platforms may read the content posted on the Save Del Cerro accounts.

On November 11, 2020, Escobar-Eck was making a presentation on Zoom to a community planning group on behalf of the Church.  During the

---

[1]     Statutory references are to the Code of Civil Procedure unless otherwise specified.

presentation, a person who only was identifiable by the name "JJ" was present. The chairperson of the Zoom meeting requested JJ's full name, but JJ refused to provide it. While Escobar-Eck was presenting, JJ sent private messages to her through Zoom's chat function. JJ accused Escobar-Eck of being dishonest about a house purchase that occurred near the Church. JJ claimed that the house was purchased to provide a second point of access for the Church.

At the end of the Zoom meeting, JJ sent a chat message to Escobar-Eck, stating, "I'm going to make sure you get sent back to where you came from." At the time of the message, Escobar-Eck did not know JJ's true identity. Later, she learned JJ was Billauer.

On November 11, 2020, Billauer posted four times under the SaveDelCerro Instagram account. The second post was a screenshot from Escobar-Eck's Zoom presentation with her photo included. Billauer commented that Escobar-Eck "works for the Church project and is trying to convince the neighborhood it's 'no big deal.' "

On December 10, 2020, Escobar-Eck posted a tweet on Twitter that was directed at Billauer's employer, Wells Fargo, that asserted Billauer is "[a] racist person who is engaging in cyberbullying."

On December 30, 2020, Billauer published a post on Instagram titled "Conflicts of Interest and Influence" that included a photo entitled "Lobbyists." The post included the following statement: "Church land use lobbyist Marcela Escobar-Eck, former Director of Development Services for the City of San Diego, has a history exerting of [sic] improper influence with City officials."

On February 5, 2021, Billauer allegedly posted the following statement on Instagram and Facebook along with a picture: "This is the lobbyist

3

disclosure form from Q4 2020, the warrant is from the past. No reason to think history won't repeat itself." The picture was a "SCHEDULE A-1: CLIENT DISCLOSURE (Lobbying Cont . . .)" and Billauer highlighted Escobar-Eck labeling her a "[f]ormer government official" and drawing a line from her name to Billauer's comment of "[t]rying to peddle influence over a municipal decision."

On the same day, Billauer posted a screenshot with a red circle around "2007 Search Warrant Atlantis Group Owner" referring to Escobar-Eck with an arrow drawn to Billauer's comment: "One of the methods to influence is to hire former government officials with personal friendships and acquaintances to facilitate municipal decisions favoring particular private entities."[2] However, the search warrant Billauer referenced was not aimed at Escobar-Eck.

On February 7, 2021, Billauer posted on the SaveDelCerro Instagram account that the Church hired Atlantis to help it get a project approved. Billauer further commented that Escobar-Eck "has been involved in many controversial projects as a lobbyist" and claiming that Escobar-Eck was being hypocritical in representing the Church.

On February 16, 2021, Billauer sued Escobar-Eck. The operative complaint includes a single cause of action entitled "Recovery of Damages." Billauer claims that Escobar-Eck's December 10 tweet constituted libel per se and intentional infliction of emotional distress.

On April 8, 2021, Billauer posted to the SaveDelCerro Twitter account an image of a person speaking out of both sides of his head with the caption, "Atlantis Group lobbies around town."

---

[2] The cross-complaint did not specify on which social media platform the post occurred.

On April 28, 2021, Escobar-Eck demurred to the complaint and moved to strike the punitive damages allegations. On that same day, Escobar-Eck filed a cross-complaint, alleging a cause of action for libel per se. Escobar-Eck based her claim for damages on the social media posts allegedly made by Billauer on December 30, 2020; February 5, 2021; February 7, 2021; and April 8, 2021.

Billauer answered the cross-complaint and subsequently brought an anti-SLAPP motion. Escobar-Eck opposed that motion, and Billauer filed a reply. Ultimately, the superior court denied the anti-SLAPP motion. In doing so, the court found that Billauer's alleged posts were protected speech under the anti-SLAPP statute, but Escobar-Eck had shown a probability of success on the merits for her libel per se claim.

Billauer timely appealed the court's order.

DISCUSSION

I

THE ANTI-SLAPP MOTION

A. The Law

"Enacted by the Legislature in 1992, the anti-SLAPP statute is designed to protect defendants from meritless lawsuits that might chill the exercise of their rights to speak and petition on matters of public concern. [Citations.] To that end, the statute authorizes a special motion to strike a claim 'arising from any act of that person in furtherance of the person's right of petition or free speech under the United States Constitution or the California Constitution in connection with a public issue.' " (*Wilson v. Cable News Network, Inc.* (2019) 7 Cal.5th 871, 883-884 (*Wilson*).)

"A court evaluates an anti-SLAPP motion in two steps. 'Initially, the moving defendant bears the burden of establishing that the challenged

allegations or claims "aris[e] from" protected activity in which the defendant has engaged. [Citations.] If the defendant carries its burden, the plaintiff must then demonstrate its claims have at least "minimal merit." ' [Citation.] If the plaintiff fails to meet that burden, the court will strike the claim." (*Wilson*, *supra*, 7 Cal.5th at p. 884.)

"The defendant's first-step burden is to identify the activity each challenged claim rests on and demonstrate that that activity is protected by the anti-SLAPP statute. A 'claim may be struck only if the speech or petitioning activity *itself* is the wrong complained of, and not just evidence of liability or a step leading to some different act for which liability is asserted.' [Citation.] To determine whether a claim arises from protected activity, courts must 'consider the elements of the challenged claim and what actions by the defendant supply those elements and consequently form the basis for liability.' [Citation.] Courts then must evaluate whether the defendant has shown any of these actions fall within one or more of the four categories of ' "act[s]" ' protected by the anti-SLAPP statute." (*Wilson, supra*, 7 Cal.5th at p. 884.)

The second step of the anti-SLAPP analysis has been described as a summary-judgment-like procedure. (*Sweetwater Union High School Dist. v. Gilbane Building Co.* (2019) 6 Cal.5th 931, 940 (*Sweetwater Union*).) The court determines whether " 'the plaintiff has stated a legally sufficient claim and made a prima facie factual showing sufficient to sustain a favorable judgment.' " (*Ibid*.) The plaintiff " 'may not rely solely on its complaint, even if verified; instead, its proof must be made upon competent admissible evidence.' ' (*Ibid*.) The defendant may submit evidence in support of its motion. (*1-800 Contacts, Inc. v. Steinberg* (2003) 107 Cal.App.4th 568, 585.) However, " '[t]he court does not weigh evidence or resolve conflicting factual

6

claims.' " (*Sweetwater Union*, at p. 940.) Rather, the court " 'accepts the plaintiff's evidence as true, and evaluates the defendant's showing only to determine if it defeats the plaintiff's claim as a matter of law. [Citation.] "[C]laims with the requisite minimal merit may proceed." ' " (*Ibid.*)

We review an order granting an anti-SLAPP motion de novo. (*Sweetwater Union, supra*, 6 Cal.5th at p. 940.) We therefore engage in the same two-step process that the trial court undertakes in assessing an anti-SLAPP motion. (See *Mendoza v. ADP Screening & Selection Services, Inc.* (2010) 182 Cal.App.4th 1644, 1651-1652.) "Only a [claim] that satisfies *both* prongs of the anti-SLAPP statute—i.e., that arises from protected speech or petitioning *and* lacks even minimal merit—is a SLAPP, subject to being stricken under the statute." (*Navellier v. Sletten* (2002) 29 Cal.4th 82, 89.)[3]

## B. The First Anti-SLAPP Prong

Billauer's "first-step burden is to identify the activity each challenged claim rests on and demonstrate that that activity is protected by the anti-SLAPP statute. A 'claim may be struck only if the speech or petitioning activity *itself* is the wrong complained of, and not just evidence of liability or a step leading to some different act for which liability is asserted.' [Citation.] To determine whether a claim arises from protected activity, courts must 'consider the elements of the challenged claim and what actions by the

_____

[3] Although not the primary thrust of his argument here, Billauer claims the superior court erred in denying his request to rule on each of the five alleged defamatory posts separately. It appears that Billauer made such an argument not in his moving papers but, for the first time, at oral argument. Nonetheless, we shall follow our high court's guidance and address the separate claims within the single pleaded cause of action of libel per se. (See *Baral v. Schnitt* (2016) 1 Cal.5th 376, 396 (*Baral*).) Alternatively stated, we will consider Billauer's anti-SLAPP motion as it relates to each of the posts made on December 30, 2020; February 5, 2021; February 7, 2021; and April 8, 2021.

7

defendant supply those elements and consequently form the basis for liability.' [Citation.] Courts then must evaluate whether the defendant has shown any of these actions fall within one or more of the four categories of ' "act[s]" ' protected by the anti-SLAPP statute." (*Wilson*, *supra*, 7 Cal.5th at p. 884.) But "[a]ssertions that are 'merely incidental' or 'collateral' are not subject to section 425.16. [Citations.] Allegations of protected activity that merely provide context, without supporting a claim for recovery, cannot be stricken under the anti-SLAPP statute." (*Baral*, *supra*, 1 Cal.5th at p. 394.)

The court in *Wilson* explained this threshold burden in more detail. For the first step of the anti-SLAPP inquiry, Billauer "must make two related showings." (*Wilson*, *supra*, 7 Cal.5th at p. 887.) "Comparing its statements and conduct against the statute, it must demonstrate activity qualifying for protection. (See § 425.16, subd. (e).) And comparing that protected activity against the complaint, it must also demonstrate that the activity supplies one or more elements of a plaintiff's claims." (*Wilson*, at p. 887; see *Rand Resources, LLC v. City of Carson* (2019) 6 Cal.5th 610, 621; *Park v. Board of Trustees of California State University* (2017) 2 Cal.5th 1057, 1062-1063.) "At this stage, the question is only whether a defendant has made out a prima facie case that activity underlying a plaintiff's claims is statutorily protected [citations], not whether it has shown its acts are ultimately lawful." (*Wilson*, at p. 888.) "If the acts alleged in support of the plaintiff's claim are of the sort protected by the anti-SLAPP statute, then anti-SLAPP protections apply." (*Id.* at p. 887.)

Billauer observes that Escobar-Eck bases her libel cause of action on five defamatory publications made on social media on the following dates: December 30, 2020 (on Instagram); February 5, 2021 (one on Instagram and one on Facebook); February 7, 2021 (on Instagram); and April 8, 2021 (on

8

Twitter).  However, Billauer says he need not address the February 5, 2021 posts because "he has never run or operated the 'Save Del Cerro' Facebook account."  We have two primary concerns about Billauer's position.

First, as alleged in the cross-complaint, Billauer posted comments on February 5, 2021 on both Instagram and Facebook.  Thus, even if we accepted Billauer's argument, he would still need to address the Instagram post because he admits that he controls the SaveDelCerro Instagram account. Second, his argument essentially is that Escobar-Eck cannot prove that he posted the February 5, 2021 comment on Facebook.  Such a contention goes to the second prong of the anti-SLAPP analysis (a probability of success on the merits).  By failing to address whether the February 5, 2021 posts are protected under the anti-SLAPP statute, at the very least, Billauer has not satisfied his burden as to those two posts.

Regarding the remaining three posts, Billauer maintains they fall within the scope of section 425.16, subdivision (e).  The superior court agreed with Billauer's position.  As such, Billauer does not devote much of his opening brief to the first prong of the pertinent anti-SLAPP analysis. Although we review an order granting or denying an anti-SLAPP motion under a de novo standard (*Sweetwater Union*, *supra*, 6 Cal.5th at p. 940) and engage in the same two-step process that the superior court undertook (see *Mendoza v. ADP Screening & Selection Services, Inc.*, *supra*, 182 Cal.App.4th at pp. 1651-1652), for purposes of our analysis here, we assume that the three statements Billauer challenges are protected speech under the anti-SLAPP statute and focus on the second prong of that statute.

## C.  Second Anti-SLAPP Prong

On the second prong of the anti-SLAPP analysis, Escobar-Eck " 'must demonstrate that [the challenged claim in the cross-complaint] is both legally

sufficient and supported by a sufficient prima facie showing of facts to sustain a favorable judgment if the evidence [she] submitted . . . is credited.' " (*Wilson v. Parker, Covert & Chidester* (2002) 28 Cal.4th 811, 821.) The second step burden of establishing a probability of prevailing is not high. (*Issa v. Applegate* (2019) 31 Cal.App.5th 689, 702 (*Issa*).) It consists of a summary-judgment-like procedure. (*Sweetwater Union*, *supra*, 6 Cal.5th at p. 940.) We first determine whether Escobar-Eck's prima facie showing is enough to win a favorable judgment. (*Ibid*.) Claims with minimal merit proceed. (*Ibid*.) We accept Escobar-Eck's evidence as true and do not weigh evidence or resolve conflicting factual claims. (*Ibid*.)

After examining Escobar-Eck's evidence, we evaluate Billauer's showings only to determine if they defeat Escobar-Eck's claim as a matter of law. (*Sweetwater Union*, *supra*, 6 Cal.5th at p. 940.) Billauer can prevail either by establishing a defense or the absence of a necessary element. (*1-800 Contacts, Inc. v. Steinberg*, *supra*, 107 Cal.App.4th at p. 585.) If there is a conflict in the evidence (the existence of a disputed material fact), the anti-SLAPP motion should be denied. (See *Oviedo v. Windsor Twelve Properties, LLC* (2012) 212 Cal.App.4th 97, 112.)

Typically, we would begin our second prong analysis by reviewing the evidence offered by Escobar-Eck. However, as a threshold issue, Billauer insists we need not engage in such analysis because all his posts were absolutely privileged under Civil Code section 47, subdivision (b). Accordingly, we address this argument first.

The litigation privilege, codified at Civil Code section 47, subdivision (b), provides that a "publication or broadcast" made in a "judicial proceeding" is privileged. The privilege extends to a judicial or quasi-judicial proceeding that is pending or is contemplated in good faith and under serious

10

consideration, and bars imposition of tort liability on a party or other authorized participant for any communication logically related to the proceeding and made to achieve its objects. (*Action Apartment Assn., Inc. v. City of Santa Monica* (2007) 41 Cal.4th 1232, 1241, 1251; *Rusheen v. Cohen* (2006) 37 Cal.4th 1048, 1057.) Communications to nonparticipants or to persons with no substantial interest in or connection to the proceeding are not privileged under Civil Code section 47, subdivision (b). (*Silberg v. Anderson* (1990) 50 Cal.3d 205, 219; *Argentieri v. Zuckerberg* (2017) 8 Cal.App.5th 768, 784; *Rothman v. Jackson* (1996) 49 Cal.App.4th 1134, 1141; *Susan A. v. County of Sonoma* (1991) 2 Cal.App.4th 88, 93.) However, under certain circumstances, courts have applied the litigation privilege to statements made during proceedings before a local city council or city planning commissions. (See *Cayley v. Nunn* (1987) 190 Cal.App.3d 300, 303 (*Cayley*); *Pettitt v. Levy* (1972) 28 Cal.App.3d 484, 488 (*Pettitt*).)

Here, Billauer argues for an extension of the litigation privilege to posts he made on social media. He has offered no authority that supports such a robust application of the privilege. In the instant matter, the posts were not made to a planning commission or local city council. (See *Cayley*, *supra*, 190 Cal.App.3d at p. 303; *Pettitt*, *supra*, 28 Cal.App.3d at p. 488.) Rather, they were made on social media accounts accessible by the public. Nonetheless, Billauer claims the posts "were made in relation to an active, official proceeding" and thus must be considered privileged. To this end, he claims the privilege is not limited to expressing his views during public meetings and should allow him to communicate with "relevant public officials in advance to prepare them for the development project coming down their pipeline." In other words, he likens his posts to preparation of materials to be presented at an official meeting. (See *Pettitt*, at pp. 490-491.) We

11

summarily reject this comparison. Billauer has offered no evidence that the subject posts were part of his preparation for an upcoming official meeting. Indeed, he does not point to any specific meeting that he plans to attend to which the posts are related. Instead, the posts simply appear to be attempts to disparage Escobar-Eck and Atlantis on social media. Moreover, our analysis does not change by virtue of Billauer claiming to "tag" certain government officials on his posts to better ensure that they will view the posts. Simply put, we see a wide chasm between Billauer's posting on social media here and direct correspondence with a city official or a presentation at a planning meeting. And Billauer provides no cogent argument to bridge this gap. Accordingly, on the record before us, we are unwilling to extend the litigation privilege to cover social media posts like the ones at issue.[4]

Having concluded that the litigation privilege does not apply, we proceed to consider whether Escobar-Eck satisfied her burden of showing a probability of success on the merits. The cross-complaint includes a single cause of action for libel per se.

Libel is the publication of an unprivileged written communication about the plaintiff that is false, defamatory, and has a natural tendency to injure. (Civ. Code, §§ 44, 45; *Jackson v. Mayweather* (2017) 10 Cal.App.5th 1240, 1259-1260 (*Jackson*).) Libel per se is when the communication is defamatory without the need for explanatory matter. (Civ. Code, § 45a.) If the plaintiff is a limited public figure, she must prove both that the challenged statement is false, and that the defendant made the libelous

---

[4] In passing, Billauer claims his posts were made "potentially in anticipation of potential litigation." This vague reference to potential litigation is utterly insufficient to show the applicability of the litigation privilege.

12

statement with " ' "actual malice." ' " (*Balla v. Hall* (2021) 59 Cal.App.5th 652, 675 (*Balla*).)

Here, Escobar-Eck bases her libel claim on social media posts made on December 30, 2020, February 5, 2021, February 7, 2021, and April 8, 2021. Billauer concedes he made the posts in question except for the February 5 posts. Escobar-Eck submitted evidence that Billauer's posts caused her to lower the rates she typically charged clients. In addition, Escobar-Eck maintains that the posts are of the type that would tend to injure her in her profession amounting to defamation per se. (See *Balla*, *supra*, 59 Cal.App.5th at p. 686.) Billauer does not challenge this evidence or otherwise argue that Escobar-Eck has not established that the posts are the type that have a natural tendency to injure Escobar-Eck. (*Jackson*, *supra*, 10 Cal.App.5th at pp. 1259-1260.) However, Billauer claims his posts are substantially true or unactionable opinion or hyperbole. Consequently, he contends Escobar-Eck cannot establish a probability of success on the merits.

"Though mere opinions are generally not actionable," a "statement that implies a false assertion of fact is actionable." (*Issa*, *supra*, 31 Cal.App.5th at p. 702; *McGarry v. University of San Diego* (2007) 154 Cal.App.4th 97, 112 [" '[s]imply couching such statements in terms of opinion does not dispel these [false, defamatory] implications' "].) " '[I]t is not the literal truth or falsity of each word or detail used in a statement which determines whether or not it is defamatory; rather, the determinative question is whether the "gist or sting" of the statement is true or false, benign or defamatory, in substance.' " (*Issa*, at p. 702; cf. *Grenier v. Taylor* (2015) 234 Cal.App.4th 471, 486 ["rhetorical hyperbole, vigorous epithets, lusty and imaginative expressions of contempt and language used in a loose, figurative sense will not support a defamation action"].)

"The 'pertinent question' is whether a 'reasonable fact finder' could conclude that the statements 'as a whole, or any of its parts, directly made or sufficiently implied a false assertion of defamatory *fact* that tended to injure' plaintiff's reputation." (*Issa, supra*, 31 Cal.App.5th at p. 703.)  "We apply a ' "totality of the circumstances" ' test to determine whether a statement is fact or opinion, and whether a statement declares or implies a provably false factual assertion; that is, courts look to the words of the statement itself and the context in which the statement was made." (*Ibid.*)  Under this test, " ' "[f]irst, the language of the statement is examined.  For words to be defamatory, they must be understood in a defamatory sense . . . .  [¶]  Next, the context in which the statement was made must be considered." ' [Citation.]  Whether challenged statements convey the requisite factual imputation is ordinarily a question of law for the court." (*Ibid.*)  With this legal foundation in mind, we turn to the content of the publications.

The December 30 post appears as follows:



As can be seen above, this post states: "Conflicts of Interest and Influence" as well as "Church land use lobbyist Marcela Escobar Eck, former Director of Development Services for the City of San Diego, has a history exerting of [*sic*] improper influence with City officials." Initially, we are satisfied that the December 30 post appears to be defamatory. It accuses Escobar-Eck of engaging in past wrongdoing and implies that she acts unethically. Thus, we conclude the statement is one that a reasonable fact finder could determine is

a factual statement that could injure Escobar-Eck's reputation. (*Issa*, *supra*, 31 Cal.App.5th at p. 703.) Escobar-Eck has satisfied her burden under the second prong as to the December 30 post.

Although Billauer does not explicitly state that the December 30 post is substantially true, opinion, or hyperbole, he states that the post "is based on a search warrant" and "[t]he search warrant speaks for itself and Billauer has no reason to doubt its contents." Therefore, it appears that Billauer is arguing the December 30 post is true.

We presume the superior court's order is correct, and the appellant must affirmatively show error. (*In re Marriage of Minkin* (2017) 11 Cal.App.5th 939, 957.) Here, Billauer merely implies the statement must be true because of a specific search warrant.[5] However, he does not explain why the search warrant establishes that Escobar-Eck has a history of exerting improper influence with City officials. He merely asserts the search warrant speaks for itself. In this sense, Billauer is asking this court to review the search warrant, ascertain the relevant portions of the search warrant, and then use those fragments to verify that the December 30 post is truthful. Billauer apparently misunderstands the role of this court. It is not our function to scour the record and make Billauer's arguments for him. (*In re Marriage of Falcone & Fyke* (2008) 164 Cal.App.4th 814, 830 (*Falcone*); *United Grand Corp. v. Malibu Hillbillies, LLC* (2019) 36 Cal.App.5th 142, 146 (*Malibu Hillbillies*).) Simply pointing to the search warrant is not sufficient to carry Billauer's burden on appeal here.

Billauer's efforts are all the more feckless because, as Escobar-Eck points out, the search warrant was not aimed at Escobar-Eck but instead,

---

[5] The search warrant bears the number 34365 and was dated March 21, 2007 at 3:16 p.m.

16

sought writings related to an individual named Thomas Story for the years 2005 and 2006. Further, the statement of probable cause in support of the search warrant referenced Escobar-Eck, but it does not accuse her of any wrongdoing. In short, Billauer has not provided evidence establishing as a matter of law that the December 30 post is not actionable. (See *Sweetwater Union, supra*, 6 Cal.5th at p. 940.)

The February 7, 2021 post appears as follows:





**Instagram**

Search

savedelcerro

Recently, as part of the Save Del Cerro opposition efforts, a few different people forwarded some tweets to SDC (because she blocks us), that Marcela recently published slandering and libeling members of the community.

This came as a result of the SDC team uncovering other tweets of her supporting the LGBTQ community, while at the same time lobbying for an applicant that supports gay conversion therapy. We stated it was quite hypocritical of her (slides 8-10).

She decided these tweets were "racist" and it set her off to publish a storm of libelous and slanderous tweets (Slides 2-7).

18 likes

FEBRUARY 7

Add a comment...    Post



savedelcerro

We are not sure how the All Peoples Church can continue to have faith in their lobbyist who attacks community members and as a result puts their project in further jeopardy of being denied.

Casually throwing out the terms "racist" and slandering to ones employer is not something to be taken lightly.

@sddistrict9 @cmraulcampillo @cmwhitburn @cd4monica @drjen_sd @joelacava_d1 @marnivonwilpert @vivianmorenoca @chrisjcate @toddgloria @marawelliott

18 likes

FEBRUARY 7

Add a comment...    Post

As can be seen in the post, it states, among other things, that Escobar-Eck "has been involved in many controversial projects as a lobbyist," that she is hypocritical in representing the Church, and that she had published "a storm of libelous and slanderous tweets." Like the December 30 post, we are satisfied that the February 7 post could be considered a defamatory fact. The post certainly paints Escobar-Eck in a negative light, again questioning the propriety of her past actions while accusing her of committing various torts. Accordingly, Escobar-Eck has satisfied her burden as to the February 7 post as well. We thus turn to Billauer's evidence.

Billauer claims the February 7 post is substantially true because Escobar-Eck was involved in the "Sunroad scandal" and the post was "prompted by [Escobar-Eck's] own prior statements about Save Del Cerro members." Further, in support of his argument, Billauer cites to a portion of Escobar-Eck's deposition transcript as well as the statement of probable cause in support of the search warrant. Yet, neither of those portions of the record establish the truth of the February 7 post.

In the section of the deposition transcript on which Billauer relies, Escobar-Eck only admits to previously working for the City before joining Atlantis. So, although Billauer can argue the deposition transcript can establish that Escobar-Eck worked for the City at one time, he cannot successfully claim that the transcript supports any of the allegedly defamatory statements contained in the February 7 post. Moreover, the statement of probable cause does not connect Escobar-Eck with "many controversial projects as a lobbyist." Indeed, it neither describes Escobar-Eck's role in the "Sunroad debacle" nor defines the "Sunroad debacle." And Billauer offers no evidence to show the truth of his assertions that Escobar-

Eck was hypocritical or tweeting libelous or slanderous material. Accordingly, Billauer has not established that the February 7 post was true.

The April 8, 2021 post appears as follows:



That post consists of a cartoon character with two mouths speaking in different directions. On the left of the character is the following quote, " 'We're in a housing crisis' " followed by a location ("College Area"). On the right side, the following appears: "Mega project Del Cerro (No houses)." In

addition, text above the cartoon says: "Are we in a housing crisis (College Area) or can we do away with an approving housing project (Del Cerro)?? If you are a lobbyist you get paid to claim both at the same time. If you are a city official, you get to vote for what's proper. #savedelcerro." Finally, to the right of the two mouthed character, the following statements are made: "Atlantis Group principal in presentation to get College area Community Planning Board to approve a project. (4/7/2021) [¶] (But in Del Cerro the Atlantis Group is happy to lobby to eliminate potential housing)".

Regarding the April 8 post, Billauer does not explain whether the post is true, hyperbole, or opinion. At most, he points out that the post "correctly notes [Escobar-Eck's] prior statement about the existence of a housing crisis." He adds that the post does not refer to Escobar-Eck by name, only her firm (Atlantis). Yet, we do not find Billauer's arguments here actually address the purported defamatory nature of the April 8 post.

During her deposition, Escobar-Eck explained why she believed the April 8 post was libelous. For example, she noted that Billauer was taking statements she made in public forums "out of context." She observed that the post implied that she was lobbying to eliminate potential housing (which she claimed not to be doing). She argued the post claims she is "talking out of both sides of [her] mouth." Escobar-Eck further described the April 8 post as "mak[ing] it sound like [she is] somebody who doesn't know what [she] is talking about, and [she is] somebody who misrepresents things to the community members." In other words, Escobar-Eck insists the post conveys her in a very negative light, that she is a clueless, duplicitous person who lobbies to eliminate potential housing while lying to the community. Indeed, the post seems aimed at undercutting Atlantis's effectiveness as a lobbyist (and by extension Escobar-Eck). And although we find the April 8 post to be

21

closer to hyperbole than other posts based on its somewhat cartoonish nature, in looking at the totality of the circumstances, we agree with Escobar-Eck that a reasonable fact finder could conclude that the subject post contains a provably false statement that injures her. (See *Issa, supra*, 31 Cal.App.5th at p. 703.) On the record before us, Billauer has not shown us that the superior court erred in reaching the same conclusion.

Certainly, the common theme connecting the December 30, February 7, and April 8 posts is Billauer's repeated assertions that Escobar-Eck is an unscrupulous person who will lie, cheat, and defame others to achieve her objectives. The fact that Billauer may mention or reference the Church project in these posts does not change the nature of them. The posts are aimed at Escobar-Eck and her company Atlantis. In making these posts, Billauer appears to be claiming that Escobar-Eck is a corrupt person, and because she represents the Church in trying to get its project approved, that the project must be crooked as well.

In summary, Escobar-Eck has satisfied her burden as to the December 30, February 7, and April 8 posts, and Billauer has not offered evidence defeating her libel claim based on those posts as a matter of law. However, the February 5, 2021 posts are different than the other posts in that Billauer claims that he did not make them.[6] To this end, he represents that he "did not draft, encourage, promote, or have any other involvement whatsoever with the Facebook publications that [Escobar-Eck] claims in this lawsuit to have been defamatory."

---

[6]     As we noted *ante*, Billauer did not satisfy his burden under the first prong of the anti-SLAPP analysis as to the February 5, 2021 posts. Nonetheless, even if he had, we explain why Escobar-Eck has shown a probability of success on the merits regarding those posts.

22

Yet, the allegations in the cross-complaint stated that Billauer made the February 5 posts on both Facebook and Instagram. Billauer does not address the alleged Instagram post. And Billauer concedes that he controls the subject Instagram account. Nonetheless, he offers no explanation here why the February 5 posts on Instagram are not actionable.[7] Thus, to the extent the February 5 posts exists on Instagram as alleged by Escobar-Eck, Billauer has forfeited any challenge to those posts here.

---

[7] During our review of the record, we observed some disagreement between the parties regarding whether the February 5 posts were ever made on Instagram. Nevertheless, Billauer does not argue in his briefs here that the February 5 posts do not exist on Instagram. He simply ignores that allegation in the cross-complaint. Again, it is not our responsibility to review the record and craft arguments on behalf of Billauer. (See *Falcone*, *supra*, 164 Cal.App.4th at p. 830; *Malibu Hillbillies*, *supra*, 36 Cal.App.5th at p. 146.)

There are two posts allegedly made on February 5, 2021. The first post appears as follows:



The first February 5 post consists of a copy of a portion of a schedule A:1 client disclosure lobbying form. The post highlights the name Atlantis (circled in black ink) as the Church's lobbying firm. Escobar-Eck's name also is circled in black as the name of a lobbyist and a stamp has been added near her name, saying "Former government official." The post also contains a red

24

line from Escobar-Eck's name to the statement: "Trying to peddle influence over a municipal decision".

The second February 5 post appears as follows:



As seen above, the second February 5 post states, "History repeats itself" and includes a red circle around the statement, "2007 Search Warrant Atlantis Group Owner." The red circle is then connected by a red arrow to

the following statement: " 'One of the methods to influence is to hire former government officials with personal friendships and acquaintances to facilitate municipal decisions favoring particular private entities."

In addition, there exists a comment on the first post that links it with the second: "This is the lobbyist disclosure form from Q4 2020, the warrant is from the past. No reason to think history won't repeat itself."

The two February 5 posts are similar to the December 30, February 7, an April 8 posts. They focus on Escobar-Eck being a lobbyist and claim that she has acted improperly in the past and will continue to do so while representing the Church. Further, the February 5 posts emphasize the search warrant. In essence, these posts imply that Escobar-Eck has engaged in criminal activity in the past and will do so again in seeking approval of the Church project. Clearly, such statements are defamatory. Indeed, Billauer does not even address the substance of the February 5 posts. Rather, the disagreement here is whether Billauer made the subject posts.

Escobar-Eck disputes that Billauer does not control the subject Facebook account but does not offer any direct evidence that Billauer controls that account. Yet, she notes that even if Billauer did not have control of the Facebook account, he still might be able to post on it. To this end, Escobar-Eck notes the similar nature of all the posts in question, Billauer's failure to identify who controls the Facebook account, the consistency of the Instagram and Facebook platforms, and the fact that the Facebook posts were assembled in the same photo-editing style used by Billauer in prior posts on Instagram. In addition, the February 5 posts concern the search warrant, on which Billauer relies heavily to "justify" the December 30 and February 7 posts.

26

Acknowledging that Escobar-Eck's burden is not high as to the second anti-SLAPP prong (*Greene v. Bank of America* (2013) 216 Cal.App.4th 454, 458), we find that she has established her libel claim based on the February 5 post has minimal merit to proceed (see *Sweetwater Union, supra,* 6 Cal.5th at p. 940). Escobar-Eck has offered some evidence that, if believed by a jury, could result in a finding of liability as to the December 5 Facebook posts. We thus evaluate Billauer's evidence.

Billauer points to his declaration in which he states that he did not make the February 5 post on Facebook. Billauer's declaration creates a question of fact for the fact finder to resolve. His evidence does not defeat Escobar-Eck's claim as a matter of law. (See *Sweetwater Union, supra,* 6 Cal.5th at p. 940.) Thus, we conclude, for purposes of our anti-SLAPP analysis only, that Escobar-Eck has shown a probability of success on the merits as to the February 5 posts.

Billauer also claims that Escobar-Eck is a limited purpose public person and as such, must prove that he made the libelous statements with actual malice. (*Balla, supra,* 59 Cal.App.5th at p. 675.) He further argues that Escobar-Eck has not shown Billauer made the posts with the required malice; therefore, the superior court erred in denying the anti-SLAPP motion.

An " 'all purpose' " public figure has " 'achiev[ed] such pervasive fame or notoriety that he becomes a public figure for all purposes and in all contexts.' " (*Reader's Digest Assn. v. Superior Court* (1984) 37 Cal.3d 244, 253 (*Reader's Digest*).) A " 'limited purpose' " public figure is one who " 'voluntarily injects himself or is drawn into a particular public controversy and thereby becomes a public figure for a limited range of issues.' " (*Ibid.*; *Copp v. Paxton* (1996) 45 Cal.App.4th 829, 845-846 [enough to " 'attempt[ ] to thrust [oneself] into the public eye' " or "influence a public decision"].)

Here, the parties quibble about whether Escobar-Eck is a limited public figure, but we do not need to resolve that disagreement. As we explain *post*, Escobar-Eck has provided clear and convincing evidence of actual malice; thus, it does not impact our analysis whether Escobar-Eck is a limited public figure.

To prove actual malice, a plaintiff must show that statements were made with " 'knowledge that [they were] false or with reckless disregard of whether [they were] false or not.' " (*Reader's Digest*, *supra*, 37 Cal.3d at pp. 256-257.) " 'There must be sufficient evidence to permit the conclusion that the defendant in fact entertained serious doubts as to the truth,' " and the evidence must be clear and convincing. (*Id.* at pp. 252, 256; see *Copp*, *supra*, 45 Cal.App.4th at p. 846 ["burden of proof by clear and convincing evidence 'requires a finding of high probability'; must 'leave no substantial doubt' "].)

"[A]ctual malice can be proved by circumstantial evidence." (*Reader's Digest*, *supra*, 37 Cal.3d at p. 257.) Considerations such as "anger and hostility toward the plaintiff," "reliance upon sources known to be unreliable [citations] or known to be biased against the plaintiff," and "failure to investigate" may, "in an appropriate case, indicate that the publisher himself had serious doubts regarding the truth of his publication." (*Id.* at p. 258.) Such evidence is relevant "to the extent that it reflects on the subjective attitude of the publisher," and failure to investigate, without more, generally is insufficient. (*Ibid*.)

Here, Billauer's direct message to Escobar-Eck provides compelling evidence that Billauer was motivated by hostility and lacked regard for the truth of his publications. (*Reader's Digest*, *supra*, 37 Cal.3d at p. 257.) We find especially telling Billauer's message to Escobar-Eck, following her Zoom

28

presentation about the Church project, contained racist undertones and threatened Escobar-Eck personally. In that message, Billauer was not advocating against the Church project or trying to convince Escobar-Eck that the project was not a good idea. Instead, he threatened her: "I'm going to make sure you get sent back to where you came from." Such a message reeks of vengeance.

However, Billauer argues actual malice is not satisfied through ill will alone. And it is certainly true that actual malice in this context requires "reckless disregard for the truth," and not "merely . . . ill will or 'malice' in the ordinary sense of the term." (*Harte-Hanks Communications, Inc. v. Connaughton* (1989) 491 U.S. 657, 667.) But hostility is relevant if it reflects on the publisher's attitude toward the truth of the statements (*Reader's Digest, supra*, 37 Cal.3d at p. 257), and it does so here.

As we discussed *ante*, Billauer claims his posts accusing Escobar-Eck of wrongdoing, unethical conduct, and questionable lobbying activities are substantially true based on the search warrant. Nonetheless, Billauer ignores that: (1) the search warrant was not directed at Escobar-Eck or Atlantis and (2) the statement of probable cause did not establish or even suggest Escobar-Eck acted improperly. Although Escobar-Eck repeatedly points out in the respondent's brief the irrelevance of the search warrant to her past activities, Billauer does not adequately address the search warrant's obvious shortcomings. At most, in his reply brief, Billauer admits "[t]he search warrant may not have been directed at [Escobar-Eck] personally," but then insists "the way in which improper influence was defined in that document lead Billauer to express his opinion that [Escobar-Eck], within the context of the Church project, was or could be exerting improper influence." Thus, Billauer completely changes his argument between his opening brief

29

and his reply brief.  In his opening brief, he argues the search warrant establishes that *his posts are substantially true*.  But in his reply brief, Billauer now claims the definition of "improper influence" in the search warrant inspired him to *express his opinion* that Escobar-Eck "was or could be exerting improper influence."  Billauer's revised argument contained in the reply brief underscores his reckless disregard for the truth in making his posts.  The foundation of his posts appears to be the search warrant.  He initially claims his posts are true.  Yet, even a cursory review of the search warrant plainly shows that it does not implicate Escobar-Eck.  Faced with this simple fact, Billauer attempts to transform the search warrant into a motivational and thought-provoking document that caused him to opine that Escobar-Eck "was or could be" acting indecorously.  But he entirely ignores that he has provided no actual reason to support his opinion.  Billauer's fatuous argument cannot carry the day.

In short, we conclude that Escobar-Eck has satisfied her burden to establish a probability of success on the merits, and Billauer has not provided evidence to defeat her claims as a matter of law.  The superior court did not err in denying the anti-SLAPP motion.

DISPOSITION

The order is affirmed.  Escobar-Eck is entitled to her costs on appeal.


HUFFMAN, Acting P. J.

WE CONCUR:


IRION, J.


DO, J.