Filed 5/14/26  Derderian v. Jabarian CA2/7

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION SEVEN

| | |
|---|---|
| HOVNAN DERDERIAN, | B343954 |
| Plaintiff and Appellant, | (Los Angeles County Super. Ct. No. 23STCV24374) |
| v. | |
| APPO JABARIAN et al., | |
| Defendants and Respondents. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Bruce G. Iwasaki, Judge.  Reversed and remanded with directions.

Harder Stonerock, Dilan A. Esper, Ryan J. Stonerock; Newport Harbor Law Group and Mark V. Asdourian for Plaintiff and Appellant.

Davis Wright Tremaine, Diana Palacios and Joel Richert for Defendants and Respondents.

_____

Hovnan Derderian, the Archbishop of the Western Diocese of the Armenian Church of North America, appeals from the judgment entered after the trial court granted publishers Appo Jabarian and HYE Media Group's (collectively, Jabarian)[1] special motion to strike under Code of Civil Procedure section 425.16.[2] Derderian alleged, as relevant on appeal, that Jabarian published seven defamatory statements about Derderian in *USA Armenian Life*, a weekly magazine owned by Jabarian. Derderian does not dispute that he is a public figure.

Derderian contends he met his burden of showing a probability of producing clear and convincing evidence of actual malice with respect to six of the alleged defamatory statements, including those alleging child abuse, misappropriation of funds, and improper conduct at a seminary in Lebanon. With respect to the seventh statement regarding alleged treason, Derderian contends the trial court erred in finding it was a nonactionable opinion. Finally, he argues the trial court abused its discretion in denying his request for discovery to meet his burden in opposing the motion to strike, specifically, his request to depose three declarants Jabarian relied on as sources for some of the statements.

The trial court erred in granting Jabarian's special motion to strike with respect to Derderian's allegations that Jabarian made false statements that Derderian misappropriated funds

---

[1] Derderian's complaint alleged Jabarian "owned and/or controlled" HYE Media Group, and the parties' briefing refers to the defendants collectively as Jabarian.

[2] Further undesignated statutory references are to the Code of Civil Procedure. Section 425.16 is commonly referred to as the anti-SLAPP statute.

from the Armenian genocide settlement fund. However, we agree with the trial court that Derderian has not met his burden of proof with respect to the other statements he alleges were defamatory. Derderian also has not shown the court abused its discretion in denying his motion for discovery. We reverse the judgment and remand for the trial court to issue a new order denying Jabarian's special motion to strike with respect to allegations regarding the Armenian genocide settlement fund and granting the special motion to strike with respect to all other alleged defamatory statements.

## FACTUAL AND PROCEDURAL BACKGROUND

A. *The Complaint*

On October 6, 2023 Derderian filed a complaint against Jabarian for defamation. The complaint alleged Derderian was the current Archbishop (also referred to as a "Primate") of the Western Diocese of the Armenian Church of North America, and he was the "spiritual leader of Christian Armenian communities throughout the [Western] Diocese." The Western Diocese was comprised of 44 individual parishes across the western United States with its headquarters in Burbank, California. The complaint alleged Jabarian, as the "editor, owner and operator" of the magazine *USA Armenian Life*, had published seven false and defamatory statements about Derderian in the magazine's October 14-20, 2022 edition (the October 2022 publication).[3]

---

[3] The complaint also alleged Jabarian published nine other defamatory statements about two judicial proceedings involving the Western Diocese. On appeal Derderian does not challenge the trial court's ruling striking all nine statements as privileged

3

Derderian attached a copy of the October 2022 publication to his complaint.

### 1. *Child abuse allegations (statement 1)*

The October 2022 publication included a heading, "Alleged Child Abuse Cover Up by Arch. Hovnan Derderian?" followed by the phrase "Armenian clergy child molester?"[4]  Under the heading was titled a "Media Inquiry" directed to the Executive Director of the Western Diocese of the Armenian Church, asking him to "confirm or deny the veracity of these allegations": "According to certain sources, Primate of the Western Diocese, Hovnan Derderian, 'committed child abuse.'  [¶]  Reportedly, the mother of the child turned to the well-known lawyer – now deceased, Vartkes Yghaiyan, to initiate a lawsuit against the Diocesan Primate Hovnan Derderian. . . .  [¶] . . .  However, at the last moment, the mother of the child must have received a 'large amount of hush-hush money['] from Archbishop Hovnan Derderian to remain silent and suspend the court case."

### 2. *Misappropriation of funds (statements 2, 3 & 4)*

The October 2022 publication alleged three statements about embezzlement and misappropriation of funds:

- *Statement 2*:  "The person behind the team in the embezzlement of Armenian Genocide Victims Settlement Funds: Western Diocese's Arch. Hovnan Derderian";

---

"fair and true report[s]" of judicial proceedings under Civil Code section 47, subdivision (d)(1).

[4]     Capitalization and boldface are omitted in the quotations from the October 2022 publication.

4

- *Statement 3*: "Arch. Derderian is directly involved in the numerous acts of misappropriation of funds"; and
- *Statement 4*: "Looting of 1st Artsakh War Fallen Soldier's Widows and Orphan Aid Fund in Canada: While he was the primate [of] the Canada Diocese, Arch. Derderian misappropriated thousands of dollars from that fund."

### 3. *Expulsion from seminary in Lebanon (statements 5 & 6)*

The October 2022 publication made two statements regarding Derderian's alleged expulsion from a seminary in Lebanon:

- *Statement 5*: "Arch. Derderian expelled from Cilicia Catholicosate in Lebanon for breaking his celibacy vows. He was caught in engaging illegal sexual acts."
- *Statement 6*: "[T]he young Derderian's mother received complaints from other mothers for his . . . sexual pass at other boys. [His] mother decides to cover up his sexual tendencies by enlisting him as a young student-priest for celibate priesthood. But he gets caught in an illegal sexual act. He gets expelled from the convent."

### 4. *Treasonous acts (statement 7)*

The October 2022 publication also quoted a statement by Jabarian purportedly made during a television broadcast of *USA Armenian Life TV*: "'Many are now convinced the three former regime kleptomaniacs,'" i.e., three former Armenian presidents, "'with [chief bishop] Catholicos of All Armenians Karekin II along with his clansmen such as Western Diocese primate Arch. Hovnan Derderian . . . have perpetrated treason against the

5

Armenian nation. Their treasonous acts range from acts of sabotage of Armenia/Artsakh's war efforts behind the front line, cutting off military supply by bribed Army general officers; corrupt army general officers' unwarranted withdrawal of Armenian army units from strategic positions; old regime assets' false propaganda designed to demoralize Armenian frontline soldiers, to massive misappropriation of funds from Diaspora designated for the twin Armenian republics' economic development and humanitarian mission.'"

In his answer, Jabarian asserted as affirmative defenses that Derderian was a public figure and could not present clear and convincing evidence of actual malice, and that some of the alleged defamatory statements were "rhetorical hyperbole or subjective statements of opinion."

B.    *Jabarian's Special Motion To Strike*

On February 7, 2024 Jabarian filed a special motion to strike under section 425.16 in which he argued that Derderian had conceded he was a public figure and could not show clear and convincing evidence of actual malice with respect to six of the statements that Derderian alleged were defamatory. Jabarian supported the motion with his declaration and declarations from Reverend Father Kevork Halladjian, Vosgan Mekhitarian, and Reverend Petros Bagramyan setting forth the basis for his belief that the six statements were true.

Jabarian argued the seventh statement about alleged treason was a nonactionable opinion because it was punctuated by vigorous insults, passionate declarations, and hyperbolic comments, and it expressed Jabarian's belief that Derderian was

6

aligned with political and church figures who were working against Armenia's best interests in "the 44-Day War."[5]

### 1. *Halladjian's declaration*

Halladjian was a deacon in charge of the Armenian Apostolic Church of Upland, California. He declared that while he was attending St. James Theological Seminary of the Armenian Patriarchate in Jerusalem in 1978, he saw two visitors enter through the seminary's gate, and the gatekeeper told him that Derderian was one of the visitors and he was there to apply for admission. Two years later, Halladjian was attending a seminary class during which the Armenian Patriarch told the

---

[5] On September 27, 2020 a war broke out between Azerbaijan and Armenia over the Nagorno-Karabakh region in the South Caucasus. The region had been controlled by Armenia since an earlier war in 1994. (Encyclopedia Britannica, Nagorno-Karabakh (updated Mar. 18, 2026) https://www.britannica.com/place/Nagorno-Karabakh [as of Mar. 26, 2026].) Over the course of 44 days, "Azeri forces captured one-third of the [Nagorno-Karabakh] region, including two ethnic Armenian population centers, as well as all of the surrounding areas that . . . [were] occupied as a buffer zone." (Epstein, *Grassroots Narrative Building As an Answer to State-Controlled Disinformation: Creating an "Artsakh Archive" to Document Ethnic Displacement in Nagorno-Karabakh* (2024) 26 Loy. J. Pub. Int. L 1, fns. omitted.) The war resulted in significant displacement of the 120,000 ethnic Armenians in the region" (*ibid.*) and substantial casualties on both sides. (Tom Ruys & Felipe Rodríguez Silvestre, *Illegal: The Recourse to Force to Recover Occupied Territory and the Second Nagorno-Karabakh War*, (2021) 32 Eur. J. Int'l L. 1287, 1287-1288.)

7

class that Derderian was not accepted to the St. James seminary because he had been expelled from a seminary in Lebanon and "was not worth ordaining as a celibate priest." At some point between 1982 and 1985, three visiting priests said during one of Halladjian's classes that Derderian had been expelled from the Lebanon seminary for having a homosexual relationship with another seminarian. Halladjian shared this information with Jabarian in 2021.

Halladjian stated regarding Derderian's alleged abuse of children that Halladjian taught at an Armenian youth camp in Dunlap, California from 2005 to 2008, and at some point he noticed that a teenage boy had stopped attending the camp. In 2022 Halladjian called the boy, who stated Derderian had invited him and two other boys to his house several years prior, and they realized when they arrived that they were alone with Derderian. "The boy did not share with [Halladjian] the specific details of what had occurred," but the boy stated "he was disgusted with the Archbishop" and "the Archbishop had abused his power." According to Halladjian, "[the boy] was angry with his mother because she had not protected him." Halladjian explained that "given the way the boy was talking and my decades of experience working with young persons . . . , it was my impression that the boy had been abused in some manner by the Archbishop . . . and was harmed psychologically by what had happened." Halladjian shared this information with Jabarian in 2022.

### 2. *Mekhitarian's declaration*

Mekhitarian formerly worked as an ordained priest for the Armenian Apostolic Church in the 1960s and 1970s. Since the 1990s he worked as an investigative journalist and paralegal in

8

Los Angeles and contributed articles to *USA Armenian Life*. From 2000 to 2005 he worked as a paralegal for attorney Vartkes Yeghiayan. Mekhitarian averred he "heard it discussed within the Armenian community on numerous occasions" that Derderian was caught engaging in sexual activity with another seminarian while at the Lebanon seminary. Mekhitarian learned through his "network within the Armenian community" that the other seminarian involved was "Father Ararat." Mekhitarian located Ararat "at least twenty years ago selling jeans in the garment district in downtown Los Angeles" and told him several people had identified him as the seminarian who engaged in sexual acts with Derderian at the Lebanon seminary. Ararat stated he did not want to discuss the matter, but he did not deny the allegation. Mekhitarian told Jabarian this information "[a]t least fifteen years ago."

### 3. *Bagramyan's declaration*

Bagramyan served as the pastor of St. Sarkis Armenian Apostolic Church of Glendale, California. He declared that in 2021 a painting contractor assisting with a church remodel told Bagramyan that a "female acquaintance" had told the contractor that Derderian molested a child several years ago. The child's family had "initiated steps to file a lawsuit" against Derderian, but the case was not pursued. Bagramyan believed what the contractor told him and had no reason to doubt the information. Bagramyan shared the information with Jabarian in 2022.

In addition, from 1979 to 1991 Bagramyan attended a seminary in Armenia while Derderian was serving as a deacon. Bagramyan heard students and reverends at the seminary discuss that Derderian had been expelled from a Lebanese

9

seminary for engaging in homosexual activity. Bagramyan did not state whether he shared this information with Jabarian.

           4.     *Jabarian's declaration*

Jabarian averred that in 2016, Yeghiayan told him that a boy's family had asked Yeghiayan to file a lawsuit against Derderian for child molestation, but the boy's mother stopped pursuing the lawsuit after Derderian paid her a large sum of money. Yeghiayan asked Jabarian to wait three years to publish the information, but he did not explain why. Jabarian later learned the California State Bar had recommended Yeghiayan be disbarred for misappropriating Armenian genocide settlement funds, but this did not cause Jabarian to have any doubts about Yeghiayan's report because he "had known . . . Yeghiayan for many decades and knew that he was a very well-respected attorney." Yeghiayan also "was a fervent advocate for important Armenian issues and causes," and his work to help a child "pursue justice for abuse suffered at the hands of an Armenian Church official was entirely consistent with Mr. Yeghiayan's character as I knew him."

In addition, the late California Supreme Court Associate Justice Armand Arabian, who was "one of the pillars of the Western Diocese," told Jabarian that Derderian had abused a boy. What Halladjian and Bagramyan told Jabarian in 2022 about reports of sexual abuse of boys "reinforced [his] belief that Mr. Yeghiayan had told [him] the truth." Further, Yeghiayan, Halladjian, and Bagramyan had previously proven to be reliable and accurate sources of information for Jabarian's reporting in the *Armenian Weekly*. On October 6, 2022 Jabarian sent an email titled "Media Inquiry" to Derderian and other Western

10

Diocese officials, asking them to confirm or deny the child abuse allegations. (Capitalization omitted.) Western Diocese attorney Brian Kabateck responded with a letter on October 11 stating the accusations were false and the Diocese had "evidence which proves that the story you have concocted is a complete farce"; however, no evidence was provided with the letter.

Jabarian declared the statements he made about Derderian being "'directly involved'" in misappropriating funds and being "'behind'" the team that embezzled from the Armenian genocide settlement fund were based on a March 23, 2022 Los Angeles Times article, which he attached to his declaration. The article stated that attorney Mark Garagos reported that $450,000 in settlement funds for Armenian victims had been paid to the "local diocese in Burbank" for routing to the Armenian Apostolic Church in Armenia, but church officials told the newspaper that the church never received the money. Jabarian knew "from [his] discussions with numerous members of the [Western Diocese] over the years" that Derderian had complete control over the Western Diocese and that nothing important was done without his approval; thus, Jabarian believed Derderian would have noticed such a large payment.

With respect to misappropriation of funds from the charitable foundation for Canadian widows and orphans, Jabarian believed the article was true because it was based on a firsthand account of the misappropriation written by Chris Chakmakian, a "respected financial consultant," who established and funded the foundation with his wife. Jabarian attached as exhibits to his declaration a copy of Chakmakian's article and an email Chakmakian sent to Jabarian a few days before the article was published that explained what had happened.

11

Jabarian stated as to the seminary expulsion statements that he had relied on Mekhitarian's and Halladjian's accounts, and he had no reason to doubt them.

5. *Derderian's opposition*

In his opposition, Derderian argued Jabarian's statements regarding child abuse and misappropriation of funds demonstrated actual malice because Derderian made serious charges that were "based purely on sketchy sources, often multiple levels of hearsay, and rumors, without obtaining any detailed information, questioning any of the sources, or confirming the stories." Further, Yeghiayan's alleged child abuse report was "incredible on its face" because the report would have violated the lawyer-client privilege, and the Los Angeles Times article Jabarian relied on for two of the statements about misappropriation of funds named many individuals but not Derderian.

Derderian argued Jabarian's statements about expulsion from the seminary were based on "third-hand rumors," and Jabarian could have contacted the Lebanon seminary to confirm the information. Derderian submitted a 2024 letter from the Lebanon seminary certifying he had graduated from the institution. Derderian further argued two of Jabarian's sources were unreliable: The California State Bar had disciplined Yeghiayan, and Mekhitarian was a convicted felon. Finally, the treason statement was not an opinion because it identified specific acts committed by Derderian "on the battlefields of Armenia," for example, cutting off military supplies, withdrawing troops, and sabotaging the war effort.

6. *The trial court's ruling*

On November 22, 2024, after a hearing, the trial court granted Jabarian's motion, striking Derderian's complaint in its entirety. In its order, the court noted there was "no real dispute" that Derderian's claims arose from protected activity. The court then considered whether Derderian's defamation claims had """"minimal merit"""" in light of his status as a public figure, and whether Derderian had demonstrated by clear and convincing evidence that Jabarian acted with actual malice in publishing the statements. The court concluded Derderian failed to show actual malice as to the first six alleged defamatory statements, and the treason statement was nonactionable opinion.

C. *Derderian's Discovery Motion*

While Jabarian's special motion to strike was pending, Derderian filed a discovery motion under section 425.16, subdivision (g), requesting to serve written discovery and to depose Jabarian, Halladjian, Mekhitarian, and Bagramyan. Derderian argued that taking the declarants' depositions would enable him to prove actual malice by determining what they told Jabarian and revealing their inherent unreliability and the lack of evidence to support their statements. The depositions would also enable Derderian to rebut Bagramyan's testimony that Derderian had "'complete control'" over the Western Diocese and to examine the specific facts supporting the statements in Halladjian's declaration. Derderian averred he could use this information to show "Jabarian had to entertain serious doubts about [their] reliability." Jabarian opposed the motion.

After a hearing, on April 12, 2024 the trial court granted Derderian's motion in part, allowing him to depose and serve

13

written discovery on Jabarian but not the three other declarants. The court reasoned as to the declarants, "The veracity of their statements [was] only tangentially related to showing whether Defendant Jabarian had actual malice . . . ." "[W]hat Defendant Jabarian was told and what he did to verify the accounts" was relevant to the actual malice inquiry, and that information "c[ould] be obtained directly from Defendant Jabarian." Further, Derderian did not state what specific facts he expected to obtain from the declarants that would show malicious intent. Instead, Derderian sought to "test and negate" the three declarations, which was not a proper basis for discovery.

On August 23, 2024 Derderian's counsel deposed Jabarian and inquired about Jabarian's sources for the statements in the complaint, the reliability of those sources, and Jabarian's investigation into the veracity of their reports (among other topics).

## DISCUSSION

A.    *Special Motions To Strike Under Section 425.16*

A cause of action arising from an act in furtherance of a defendant's constitutional right of petition or free speech in connection with a public issue is subject to a special motion to strike unless the plaintiff demonstrates a probability of prevailing on the claim. (§ 425.16, subd. (b)(1); see *Serova v. Sony Music Entertainment* (2022) 13 Cal.5th 859, 871.) An "'act in furtherance of a person's right of petition or free speech under the United States or California Constitution in connection with a public issue'" includes, in relevant part, "any written or oral statement or writing made in a place open to the public or a

14

public forum in connection with an issue of public interest." (§ 425.16, subd. (e)(3).)

"Litigation of an anti-SLAPP motion involves a two-step process. First, 'the moving defendant bears the burden of establishing that the challenged allegations or claims "aris[e] from" protected activity in which the defendant has engaged.' [Citation.] Second, for each claim that does arise from protected activity, the plaintiff must show the claim has 'at least "minimal merit."' [Citation.] If the plaintiff cannot make this showing, the court will strike the claim." (*Bonni v. St. Joseph Health System* (2021) 11 Cal.5th 995, 1009.)

""'Only a cause of action that satisfies *both* prongs of the anti-SLAPP statute . . . is a SLAPP, subject to being stricken under the statute.""' (*Barry v. State Bar of California* (2017) 2 Cal.5th 318, 321.) Where, as here, the parties do not dispute that the challenged allegations arise from protected activity, courts have bypassed the first-prong analysis. (See *Issa v. Applegate* (2019) 31 Cal.App.5th 689, 701 (*Issa*); *Cruz v. City of Culver City* (2016) 2 Cal.App.5th 239, 250.)

"As to the second step, a plaintiff seeking to demonstrate the merit of the claim 'may not rely solely on its complaint, even if verified; instead, its proof must be made upon competent admissible evidence.'" (*Monster Energy Co. v. Schechter* (2019) 7 Cal.5th 781, 788; § 425.16, subd. (b)(2) ["In making its determination, the court shall consider the pleadings, and supporting and opposing affidavits stating the facts upon which the liability or defense is based."].) "'We have described this second step as a "summary-judgment-like procedure." [Citation.] The court does not weigh evidence or resolve conflicting factual claims. Its inquiry is limited to whether the plaintiff has stated a

legally sufficient claim and made a prima facie factual showing sufficient to sustain a favorable judgment.  It accepts the plaintiff's evidence as true, and evaluates the defendant's showing only to determine if it defeats the plaintiff's claim as a matter of law.'"  (*Monster Energy*, at p. 788.)

We review de novo the grant or denial of a special motion to strike, "evaluating the context and content of the asserted activity."  (*Wilson v. Cable News Network, Inc.* (2019) 7 Cal.5th 871, 884-885.)

B.      *The Trial Court Erred in Granting Jabarian's Special*
         *Motion To Strike Two Statements Regarding Alleged*
         *Misappropriation of Armenian Genocide Settlement Funds*
         *but Not the Other Statements*
1.      *Governing law*

The elements of a defamation claim are "'(a) a publication that is (b) false, (c) defamatory, and (d) unprivileged, and that (e) has a natural tendency to injure or that causes special damage.'"  (*Taus v. Loftus* (2007) 40 Cal.4th 683, 720.)  Where, as here, the plaintiff is a public figure, the plaintiff must prove, by clear and convincing evidence, "that the libelous statement was made with "'actual malice"—that is, with knowledge that it was false or with reckless disregard of whether it was false or not.'" (*Reader's Digest Assn. v. Superior Court* (1984) 37 Cal.3d 244, 256-257 (*Reader's Digest*); accord, *Edward v. Ellis* (2021) 72 Cal.App.5th 780, 793.)  In the context of a special motion to strike, "[a] public figure suing for libel must therefore establish a probability that [he or] she will be able to produce clear and convincing evidence of actual malice."  (*Annette F. v. Sharon S.*

16

(2004) 119 Cal.App.4th 1146, 1167 (*Annette F.*); accord, *Hoang v. Tran* (2021) 60 Cal.App.5th 513, 537.)

"Reckless disregard . . . requires [a] defendant . . . to have a high degree of awareness of probable falsity" (*Collins v. Waters* (2023) 92 Cal.App.5th 70, 73; accord, *Young v. CBS Broadcasting, Inc.* (2012) 212 Cal.App.4th 551, 563), and "'[t]here must be sufficient evidence to permit the conclusion that the defendant in fact entertained serious doubts as to the truth of his publication.'" (*Hoang v. Tran, supra*, 60 Cal.App.5th at p. 537; accord, *Annette F., supra*, 119 Cal.App.4th at p. 1167 ["The existence of actual malice turns on the defendant's subjective belief as to the truthfulness of the allegedly false statement."].) Accordingly, "'[g]ross or even extreme negligence will not suffice to establish actual malice.'" (*Christian Research Institute v. Alnor* (2007) 148 Cal.App.4th 71, 88 (*Christian Research*); accord, *Annette F.*, at p. 1167.)

"Actual malice may be proved by direct or circumstantial evidence. Factors such as failure to investigate, anger and hostility, and reliance on sources known to be unreliable or biased 'may in an appropriate case, indicate that the publisher himself had serious doubts regarding the truth of his publication.' [Citation.] However, any one of these factors, standing alone, may be insufficient to prove actual malice or even raise a triable issue of fact." (*Annette F., supra*, 119 Cal.App.4th at p. 1167; accord, *Reader's Digest, supra*, 37 Cal.3d at pp. 257-258.) Further, "such evidence is relevant only to the extent that it reflects on the subjective attitude of the publisher." (*Reader's Digest*, at p. 258.)

17

### 2. *Derderian's evidence of Jabarian's protests against him does not show actual malice*

Derderian contends Jabarian published the defamatory statements based on his hostility toward Derderian. He relies on evidence showing that in late 2018 Jabarian held a "peaceful protest" in front of the Western Diocese headquarters by hanging signs from a truck, one of which stated, "'New Catholicos, New Primate'" with an image of Derderian.[6]

"A court may consider a defendant's anger or hostility toward a plaintiff in determining the presence of malice only to the extent it impacts the defendant's actual belief concerning the truthfulness of the publication. [Citation.] The focus is thus on the "'defendant's attitude toward the truth or falsity of the material published . . . [not] the defendant's attitude toward the plaintiff.'"" (*Christian Research, supra*, 148 Cal.App.4th 71, 92.) Courts have found a publisher's anger or hostility toward a plaintiff supports a finding of actual malice where the statements are made close in time to the published statements and are directly related to those statements. (See, e.g., *Balla v. Hall* (2021) 59 Cal.App.5th 652, 661, 683 [text message that defendant needed "'retaliation'" against plaintiff made a few months before challenged statements showed vengeful motive]; *Burrill v. Nair* (2013) 217 Cal.App.4th 357, 374-375, 391 (*Burrill*) [defendant threatened plaintiff he would "follow up with . . . the media" before making the first challenged statements (italics omitted)],

---

[6]    Derderian argues Jabarian conducted multiple protests against him outside the Western Diocese. Although Jabarian admitted he conducted protests before the 2018 protest, there is no evidence that any were directed toward Derderian.

18

disapproved on another ground in *Baral v. Schnitt* (2016)
1 Cal.5th 376, 391, 394-396.)

Although Jabarian's protest shows that in 2018 Jabarian
wanted Derderian to be replaced as the archbishop, the protests
do not support an inference that Jabarian fabricated the
statements four years later or doubted the veracity of the
statements when he published them.  (See *Fletcher v. San Jose
Mercury News* (1989) 216 Cal.App.3d 172, 186 [reporter's
statement that plaintiff was a "'crook'" and he wanted to "'get
people like [him] out of office'" were "personal attitudes" and not
linked to defendant's awareness of probable falsity].)

> 3.    *Derderian failed to make a prima facie showing of*
>        *actual malice regarding the child abuse statement*

Derderian contends Jabarian had reason to question
Yeghiayan's reliability as a source because Derderian knew about
the State Bar's proposed disbarment of Yeghiayan for
misappropriating money from the Armenian genocide settlement
fund.  We agree this information should have caused Jabarian to
question the veracity of Yeghiayan's report and to investigate his
claims of child abuse.  (See *Burrill, supra*, 217 Cal.App.4th at
p. 393 [source's arrest and placement in psychiatric facility
provided obvious reason to doubt his reports]; see also *In re
Garcia* (2014) 58 Cal.4th 440, 460 [""'There is certain conduct
involving fraud, perjury, theft, embezzlement, and bribery where
there is no question but that moral turpitude is involved.'"'"].)
But, as Jabarian argues, he waited to publish the accusations
until he had three corroborating sources, two of whom provided
declarations.  In light of the corroboration, Derderian did not

meet his burden of making a prima facie showing of actual malice regarding the child abuse statements.[7]

As discussed, all three corroborating sources were prominent members of the Armenian community. Derderian seeks to poke holes in the three accounts, but each source provided some corroboration of Yeghiayan's description of what had happened. Halladjian, a deacon in an Armenian church, recounted that based on his decades of experience with young people, he believed Derderian had abused and psychologically harmed a teenage boy who later spoke with Halladjian. Derderian argues Halladjian's account was not credible because Jabarian's description of what Halladjian told him was different from what Halladjian stated in his declaration, specifically, that Halladjian reported the abuse took place in Derderian's house in Burbank, but Jabarian recalled Halladjian stating the abuse took place at Derderian's house on the campground. The fact Jabarian in 2024 incorrectly recalled a detail he was told two years earlier does not show that he fabricated the story (which would mean Halladjian did as well) or that Jabarian entertained serious doubts about the truth of the report.

Moreover, Derderian does not on appeal challenge the statements by pastor Bagramyan, who in his declaration corroborated Yeghiayan's account of child abuse and the proposed

---

[7] Derderian also argues Jabarian had an obvious reason to doubt Yeghiayan's report of child abuse because the disclosure would have breached the attorney-client privilege. However, clients may waive the privilege by consenting to disclosure (Evid. Code § 912, subd. (a)), and nothing in the record shows that Jabarian had a reason to believe Yeghiayan's disclosure would have breached the privilege.

20

lawsuit.  We recognize Bagramyan relied on what the painting contractor for the church heard from a female acquaintance, reducing its reliability, but Bagramyan declared he believed the painting contractor and had no reason to question the veracity of his statements.

The third source was Supreme Court Justice Arabian, who (according to Jabarian) told Jabarian in late 2016 that Derderian had abused a boy.  Derderian contends Jabarian's report was not credible because Jabarian claimed Justice Arabian told him he had severed his relationship with Derderian as a result of the abuse, but Derderian and Justice Arabian had a "cordial relationship" until Justice Arabian's death.  Further, Derderian stated that in 2017 he presided over an event honoring Justice Arabian's wife, and Justice Arabian thanked Derderian for his kind words at the event.  We accept the statements in Derderian's declaration as true for purposes of the special motion to strike, but Derderian submitted no evidence that Jabarian was aware of Justice Arabian's attendance at the 2017 event.  Moreover, Justice Arabian could have remained cordial with Derderian in his role as the archbishop and thanked him for his kind words at the 2017 event but still severed their prior personal relationship.

Derderian also argues the fact that Jabarian published the child abuse statements only after two of his claimed sources died (Yeghiayan and Justice Arabian) shows that Jabarian fabricated the statements and purposefully waited to publish the statements so his sources could not be tested.  It is speculation that Jabarian purposefully "waited years until these individuals died" to publish the child abuse allegations.  Further, during the two-year interval Jabarian obtained corroboration from

21

Halladjian and Bagramyan, both of whom submitted declarations. Finally, Derderian argues Jabarian's failure to provide details of the child abuse, including the full name of the boy, when the incident occurred, or what Derderian did to the boy, shows the "tall tales" of child abuse were fabricated. This too is speculation—it is not surprising that Justice Arabian and the other sources would not have felt comfortable disclosing the boy's full name or details about what had happened.

At most, the issues raised by Derderian suggest that Jabarian should have responsibly investigated further whether Derderian had sexually abused a boy before publishing that the abuse took place. But a "'mere failure to investigate the truthfulness of a statement, even when a reasonably prudent person would have done so, is insufficient' to demonstrate actual malice." (*Christian Research, supra*, 148 Cal.App.4th at p. 90; see *Reader's Digest, supra*, 37 Cal.3d at p. 259 ["A publisher does not have to investigate personally, but may rely on the investigation and conclusions of reputable sources."].)[8]

---

[8] The fact the Western Diocese prior to publication sent a letter claiming the child abuse statement in the media inquiry were not true does not show actual malice. "'A denial only serves to buttress a case for actual malice when there is something in the content of the denial or supporting evidence produced in conjunction with the denial that carries a doubt-inducing quality.'" (*Young v. CBS Broadcasting, Inc., supra*, 212 Cal.App.4th at p. 564; accord, *OneTaste Inc. v. Netflix, Inc.* (2025) 116 Cal.App.5th 174, 192.) The Western Diocese's letter denied the allegation and stated it had evidence demonstrating the statement was false, but it did not describe or attach any evidence.

4. *Derderian made a prima facie showing of actual malice with respect to misappropriation of funds for the Armenian genocide settlement fund but not as to the Canadian fund*

Derderian contends he met his burden to make a prima facie showing of actual malice with respect to Jabarian's statements accusing him of being "directly involved" in and "behind" the team that misappropriated funds from the Armenian genocide settlement fund. Specifically, he argues the Los Angeles Times article Jabarian relied on did not mention Derderian, and Jabarian's personal belief that Derderian must have been involved was not sufficient to defeat a showing of actual malice. We agree Derderian met his burden.

The Los Angeles Times article supported Jabarian's assertion that $450,000 in settlement funds were transferred to the "local diocese in Burbank" (the Western Diocese), which was supposed to transfer the funds to a church in Armenia, but the church never received the funds. But the article does not mention Derderian or any role he played in the receipt, transfer, or misappropriation of the funds. Jabarian's reliance on the Los Angeles Times article, without any evidence Derderian was involved, supports an inference the statement was fabricated or made with reckless disregard for the truth. (See *Burrill, supra,* 217 Cal.App.4th at p. 393 [an "an unambiguous inference of fabrication" arose where defendant cited no source supporting his allegation].)

The only other support Jabarian provided for his statements that Derderian misappropriated the settlement funds was his personal belief from conversations with unidentified church members "over the years" that Derderian had "complete

23

control" over the Western Diocese; thus Jabarian believed such a large transfer of money would not "go unnoticed" by Derderian. However, it is a large leap from the fact an archbishop has control over a diocese to the conclusion he must have been involved in the theft of funds intended for the church in Armenia.[9]  As the United States Supreme Court explained in *St. Amant v. Thompson* (1968) 390 U.S. 727, 732, a publisher cannot "insure a favorable verdict by testifying that he published with a belief that the statements were true."  Because Jabarian provided no other basis for his statements beyond his personal belief it was true, Derderian has shown a probability he will be able to produce clear and convincing evidence of actual malice.

We reach a different conclusion with respect to Jabarian's statement that Derderian misappropriated funds from a charitable foundation for Canadian widows and orphans. Chakmakian, a founder of the fund, described in his email to Jabarian how Derderian redirected the funds intended for needy children in Armenia to "children and families of [Derderian's] puppet priests and minions in Armenia."  Derderian contends Jabarian had actual malice in reporting the story because Jabarian knew Chakmakian disliked Derderian, and further, Jabarian admitted he never fact-checked Chakmakian's

---

[9]  Bagramyan made a similar statement in his declaration that, based on his observation of Derderian at church events over the prior five years, "Derderian has complete control over the Western Diocese and that nothing of consequence happens without his knowledge."  Neither Bagramyan nor Jabarian state that Bagramyan shared this observation with Jabarian. Moreover, Bagramyan does not provide any basis for the statement (other than his observation of Derderian at church events).

statements, reviewed any documents regarding the misappropriation, or recalled if the Canadian fund demanded Derderian repay the money. However, as discussed, a failure to investigate, without more, does not show the publisher had actual malice. (*Christian Research, supra*, 148 Cal.App.4th at p. 90.) Nor does the fact that Chakmakian severed ties with Derderian after learning of the misdirection of the Canadian funds show he was biased in his reporting of what had happened (or that Jabarian would have had serious doubts about the reporting). (See *Reader's Digest, supra*, 37 Cal.3d at p. 260 [individual's statement that plaintiff seemed "'very, very nasty . . . and litigious as hell'" did not demonstrate bias and instead was "a reasonable reaction" to what individual learned about plaintiff's previous actions].)

5. *Derderian failed to make a prima facie showing of actual malice with respect to the seminary expulsion statements*

Derderian contends Jabarian acted with actual malice in publishing the seminary expulsion statements because he failed to check readily available sources to confirm he was expelled. Derderian relies on a letter he obtained in 2024 from the Lebanese seminary certifying he graduated from the seminary in 1975. Derderian has not met his burden to make a prima facie showing of actual malice.

"Although failure to investigate will not alone support a finding of actual malice, [citation], the purposeful avoidance of the truth is in a different category." (*Harte-Hanks Communications, Inc. v. Connaughton* (1989) 491 U.S. 657, 692; see *Khawar v. Globe Int'l., Inc.* (1998) 19 Cal.4th 1073A, 259, 276-

25

277 [plaintiff made showing of actual malice to support damages award where the publisher accused a private figure of assassinating Robert Kennedy without "review[ing] the voluminous public records" to the contrary or "contact[ing] any of the eyewitnesses to the assassination, some of whom were prominent individuals who could easily have been located"].) In *Harte-Hanks,* the United States Supreme Court held a newspaper's failure to listen to exculpatory audiotapes that the plaintiff had made available to the newspaper supported a finding of actual malice. (*Harte-Hanks*, at pp. 683, 692.) Likewise, in *Collins v. Waters* (2023) 92 Cal.App.5th 70, 73-75, 85, the plaintiff made a prime facie showing of actual malice where the defendant continued to state a political opponent's military discharge was dishonorable after the plaintiff provided the defendant a copy of what appeared to be an official document showing the contrary.

Derderian's reliance on *Connaughton, Collins*, and *Khawar* is misplaced. Unlike the facts in those cases, Derderian provided no evidence that Jabarian was aware of a record of Derderian's 1975 graduation or that Jabarian could have obtained the record from the seminary without Derderian's consent. Jabarian's lack of any effort to confirm whether Derderian graduated from the seminary may have shown Jabarian's negligent investigation, but not his purposeful avoidance of the truth. (See *Beilenson v. Superior Court* (1996) 44 Cal.App.4th 944, 952 [plaintiff "charges that had [defendant] contacted the [Fair Political Practices Commission] he would have discovered that [plaintiff] was in compliance with the law. 'Failure to investigate does not in itself establish bad faith.'"].)

Derderian also argues Mekhitarian was an unreliable source because he was convicted of felony grand theft and immigration fraud.  However, Jabarian testified at his deposition that he was unaware of Mekhitarian's felony convictions, and Derderian provided no evidence that Jabarian was aware of the convictions.  Thus, Derderian has not shown Jabarian had a subjective belief Mekhitarian was not a reliable source.  Moreover, Derderian does not question the reliability of Halladjian, who corroborated Mekhitarian's account that Derderian was expelled from the seminary for homosexual conduct.[10]

C.      *The Trial Court Did Not Err in Concluding Jabarian's Statement Regarding Treason Was a Nonactionable Opinion*

1.      *Governing law*

"""'The sine qua non of recovery for defamation . . . is the existence of falsehood.'  [Citation.]  Because the statement must contain a provable falsehood, courts distinguish between statements of fact and statements of opinion for purposes of defamation liability.  Although statements of fact may be actionable as libel, statements of opinion are constitutionally

---

[10]     Derderian also argues Jabarian's failure to locate Father Ararat (the other seminarian allegedly involved in the sexual activity), who was living in Los Angeles, supported a finding of actual malice.  At most this is further evidence of negligent failure to investigate, not actual malice.  Derderian does not provide any argument regarding Jabarian's report that Derderian's mother sent him to the seminary because of complaints about his homosexual tendencies as a child.

protected.""" (*ZL Technologies, Inc. v. Does 1-7* (2017) 13 Cal.App.5th 603, 624; accord, *Baker v. Los Angeles Herald Examiner* (1986) 42 Cal.3d 254, 259-260 ["'In this context courts apply the Constitution by carefully distinguishing between statements of opinion and fact, treating the one as constitutionally protected and imposing on the other civil liability for its abuse'"].)

"'Though mere opinions are generally not actionable,' a 'statement . . . that implies a false assertion of fact is actionable.'" (*Billauer v. Escobar-Eck* (2023) 88 Cal.App.5th 953, 967 [statements suggesting lobbyist for church had improperly lobbied city officials in the past were statements of fact, not opinion]; see *Issa, supra*, 31 Cal.App.5th at pp. 702, 706 [statement that politician had "'[g]amed the system to line his own pockets'" was not provably false, and therefore was nonactionable opinion].) "Thus, the 'inquiry is not merely whether the statements are fact or opinion, but "'whether a reasonable fact finder could conclude the published statement declares or implies a provably false assertion of fact.'"'" (*Jackson v. Mayweather* (2017) 10 Cal.App.5th 1240, 1261; accord, *Billauer*, at p. 967.) Further, "'it is not the literal truth or falsity of each word or detail used in a statement which determines whether or not it is defamatory; rather, the determinative question is whether the "gist or sting" of the statement is true or false, benign or defamatory, in substance.'" (*Issa*, at p. 702; accord, *Ringler Associates Inc. v. Maryland Casualty Co.* (2000) 80 Cal.App.4th 1165, 1181-1182.)

"To ascertain whether the statements in question are provably false factual assertions, courts consider the totality of the circumstances." (*GetFugu, Inc. v. Patton Boggs LLP* (2013)

220 Cal.App.4th 141, 156; accord, *Nygard, Inc. v. Uusi–Kerttula* (2008) 159 Cal.App.4th 1027, 1049.) "'Under the totality of the circumstances test, "[f]irst, the language of the statement is examined. . . . [¶] Next, the context in which the statement was made must be considered."'" (*Issa, supra*, 31 Cal.App.5th at p. 703; accord, *Franklin v. Dynamic Details, Inc.* (2004) 116 Cal.App.4th 375, 385.) "Whether challenged statements convey the requisite factual imputation is ordinarily a question of law for the court." (*GetFugu*, at p. 156; accord, *Nygard*, at p. 1049.)

### 2. *The treason statement was a nonactionable opinion*

The treason statement in the October 2022 publication was couched in "'rhetorical hyperbole,' 'vigorous epithet[s],' 'lusty and imaginative expression[s] of . . . contempt,' and language used 'in a loose, figurative sense,'" which "have all been accorded constitutional protection." (*Nygard, Inc. v. Uusi-Kerttula, supra*, 159 Cal.App.4th at p. 1048.) The beginning of the article discussed how many Armenians felt about the "'mindset among certain Armenian male-chauvinistic, ignorant, self-centered, egomaniacs, unpatriotic, un-Armenian elements.'" The article then referred to three former Armenian presidents as "regime kleptomaniacs" and described Derderian and other religious leaders as "clansmen" who "perpetrated treason against the Armenian nation." Jabarian exclaimed his "'firm belief . . . that the Armenians have . . . lost the war . . . to treason!'" These hyperbolic statements would indicate to the average reader that Jabarian was expressing his personal opinion about the quality of political and religious leadership in the Armenian community. Moreover, the statements are not provably false.

29

Further, terms of "apparency" qualified the article's language. (See *Baker v. Los Angeles Herald Examiner* (1986) 42 Cal.3d 254, 260-261.)[11] As the court in *Baker* explained, "[w]here the language of [a] statement is 'cautiously phrased in terms of apparency,' the statement is less likely to be reasonably understood as a statement of fact rather than opinion." (*Ibid*., fn. omitted.) On that basis the court in *Baker* held the statement beginning with the phrase "'[m]y impression is'" was an opinion, reasoning that "[w]hen one states a view in terms of an 'impression,' the listener or reader is on notice that the maker is not vouching for its accuracy. A reasonable person would understand that a statement of opinion rather than of fact was to follow." (*Id.* at pp. 261-262.)

Jabarian prefaced the treason article with language of apparency, including that "'many Diaspora and Homeland Armenians *feel* that they've had it with the . . . mindset among Armenian . . . egomaniacs." (Italics added.) The article continued by saying many in the Armenian community were now "convinced" and Jabarian was of the "firm belief" that the Armenians lost the war as a result of treason. These phrases signaled to the reader that the publication was expressing the opinions of the author and other members of the Armenian community.

Moreover, the 44-day war and its losses for Armenia, which was the focus of the article, were an issue of public concern in the Armenian community. Thus, the statement was "the same kind

_____

[11] The court in *Baker* explained that "apparency" referred to something being "apparent," as if the publisher was saying "'[i]t appears to me.'" (*Baker v. Los Angeles Herald Examiner, supra*, 42 Cal.3d at pp. 260-261, 263, fn. 4.)

of expression of opinion . . . typically generated in the heat of a political controversy." (*Carr v. Warden* (1984) 159 Cal.App.3d 1166, 1168, 1170 [published statement by project opponent that "I think someone is being bought on the Planning Commission" was nonactionable opinion where made in connection with vote on zoning ordinance that was subject of "considerable [public] debate"]; see *Issa, supra*, 31 Cal.App.5th at p. 704 [""[T]hose engaged in political debate are entitled not only to speak responsibly but to ' . . . speak foolishly and without moderation.""""].)

Derderian contends the treason statement was not an opinion because it included a series of factual claims, including that Derderian sabotaged Armenia's war efforts and cut off military supplies. However, these claims lacked sufficient specificity to constitute provable factual assertions. For example, the article accused Derderian and the three other leaders of playing a role in the "corrupt army general officers' unwarranted withdrawal of Armenian army," the cutting off of military supplies by unidentified army officers who were bribed, and "false propaganda designed to demoralize Armenian frontline soldiers." Whether an officer is corrupt, a withdrawal of solders is unwarranted, unidentified officers were bribed to cut off military supplies, or something is propaganda are not provable statements. Likewise, it is not provable whether Derderian and others engaged in unspecified acts of sabotage of the Armenian war efforts. The article failed to specify what acts were taken, when or where they occurred, or how Derderian was involved, preventing the statements from being proven true or false. (See *Chaker v. Mateo* (2012) 209 Cal.App.4th 1138, 1142, 1149-1150 [statements accusing former romantic partner "of fraud, deceit

31

and picking up street walkers and homeless drug addicts," "taking steroids," and being involved in "illegal activities" were nonactionable opinions because "they lack[ed] any specificity as to the time or place of [plaintiff]'s supposed behavior"].)

*Sanders v. Walsh* (2013) 219 Cal.App.4th 855, relied on by Derderian, is distinguishable. The disputed statements in *Sanders* were mostly preceded by the word "'Fact,'" recited "specific factual claims" of perjury and fraud, referred to the plaintiff in stating city contracts were being awarded to friends and family members, and stated plaintiff took "bribes." (*Id.* at p. 864.) For example, one statement read: "Fact: [Plaintiff] who works for the City of [Anaheim], CA . . . wrote an unauthorized check out of her boyfriend[']s . . . account" to pay for a wig purchased by her mother, and wrote on the check that it was for a ""Prosthetic Donation.""" (*Id.* at p. 859.) By contrast, Jabarian's statement in the article lacked the specificity of the statements in *Sanders,* was made in connection with a contentious political issue, and was preceded by language of apparency.

D. *The Trial Court Did Not Abuse Its Discretion in Denying Derderian's Request To Depose Jabarian's Declarants*

1. *Governing law and standard of review*

Section 425.16, subdivision (g), provides that upon the filing of a special motion to strike, "[a]ll discovery proceedings in the action shall be stayed . . . until notice of entry of the order ruling on the motion." The discovery stay "reflect[s] the statutory purpose to prevent and deter SLAPP suits by ending them early and without great cost to the SLAPP target." (*Britts v. Superior Court* (2006) 145 Cal.App.4th 1112, 1124.)

"A trial court may lift the statutory stay for 'good cause' [citations], which requires a showing that the specific discovery sought is both 'needed . . . to establish a prima facie case' and 'tailored to that end.'" (*Abir Cohen Treyzon Salo, LLP v. Lahiji* (2019) 40 Cal.App.5th 882, 891; accord, *Britts v. Superior Court, supra*, 145 Cal.App.4th at p. 1125.) "To satisfy this 'good cause' standard, a party must "'*explain what additional facts* [*it*] *expects to uncover*.'" (*Six4Three, LLC v. Facebook, Inc.* (2025) 109 Cal.App.5th 635, 659; accord, *Sipple v. Foundation For Nat. Progress* (1999) 71 Cal.App.4th 226, 247). Further, "'[d]iscovery may not be obtained merely to "test" the opponent's declarations.'" (*Abir*, at p. 891.) "We review a trial court's denial of a motion to lift the stay for abuse of discretion." (*Abir*, at p. 891; accord, *1-800 Contacts, Inc. v. Steinberg* (2003) 107 Cal.App.4th 568, 593.) A ruling constitutes an abuse of discretion if it is "'so irrational or arbitrary that no reasonable person could agree with it.'" (*Sargon Enterprises, Inc. v. University of Southern California* (2012) 55 Cal.4th 747, 773.)

2. *The trial court did not abuse its discretion*

Derderian contends the trial court abused its discretion in denying his request to depose the three individuals who submitted declarations in support of Jabarian's special motion to strike and then relying on the declarations to grant the motion. The court did not abuse its discretion.

In his motion, Derderian argued the depositions would "show that the information upon which Jabarian claims to have relied was entirely unreliable (because it was self-contradictory, contained unbelievable details, or came from obviously unreliable sources)." ~(5 AA 461)~ And on appeal, Derderian highlights that

33

there were inconsistencies between the facts as described by the declarants and the facts presented by Jabarian. ~(AOB 58)~ But testing the reliability of the declarants was not a proper basis for conducting discovery under section 425.16. (*Abir Cohen Treyzon Salo, LLP v. Lahiji, supra*, 40 Cal.App.5th at p. 891.) Further, Derderian was allowed to take Jabarian's deposition, during which he could have elicited facts to challenge the reliability of Jabarian's sources.

Whether Derderian is correct that the trial court should have allowed him to take the depositions of the declarants to determine what they told Jabarian is a closer call. The court agreed that what the declarants told Jabarian was relevant, but it observed this information could "be obtained directly from Defendant Jabarian." ~(5 AA 499)~ Further, as Jabarian points out, Derderian could have sought to interview the declarants (all of whom were or had been clergy in Armenian churches), and nothing prevented Derderian from performing his own investigation—which he did, discovering that Mekhitarian had prior convictions and Yeghiayan was disciplined by the State Bar. (See *Paterno v. Superior Court* (2008) 163 Cal.App.4th 1342, 1351, fn. 4 [plaintiff should address in seeking discovery to oppose anti-SLAPP motion "'whether the information the plaintiff seeks to obtain through formal discovery proceedings is readily available from other sources or can be obtained through informal discovery'"]; *The Garment Workers Center v. Superior Court* (2004) 117 Cal.App.4th 1156, 1162 [same].)[12] Although the court

---

[12] Derderian argues on appeal that Jabarian forfeited the argument that Derderian could take informal discovery from other sources by failing to raise it in the trial court. ~(ARB 40)~ We decline to find forfeiture because Jabarian argued in the trial

34

reasonably could have allowed Derderian to depose the three declarants (with appropriate time or subject matter limitations), we cannot say the court's decision in denying discovery of the declarants but allowing Derderian to obtain the information from Jabarian (or other sources) was irrational or arbitrary. (See *Sargon Enterprises, Inc. v. University of Southern California, supra*, 55 Cal.4th at p. 773.)

Likewise, the trial court did not abuse its discretion in relying on the declarants' statements in granting Jabarian's special motion to strike. Section 425.16, subdivision (b)(2), provides that "the court shall consider . . . supporting and opposing affidavits stating the facts upon which the liability or defense is based" in ruling on a special motion to strike. Derderian argues it was unfair to rely on the three declarations because he could not present rebuttal evidence without taking the declarants' depositions. But the court granted Derderian's request to depose and seek documents from Jabarian, and the central question was whether Jabarian believed the statements from the declarants were true, not whether the declarants provided false statements. (See *Balla v. Hall, supra*, 59 Cal.App.5th at p. 693 ["libel defendant 'will generally be the principal . . . source of evidence'" of actual malice].)

---

court that there was no need to take the depositions of the third-party declarants to learn what they told Jabarian (among other topics),~(5 AA 482)~ and his contention on appeal that Derderian could have inquired about those communications from both Jabarian and informal discovery of the declarants is consistent with that argument.

## DISPOSITION

The judgment in favor of Jabarian and the order granting Jabarian's special motion to strike are reversed.  The cause is remanded with directions to the trial court to enter a new order denying Jabarian's special motion to strike the allegations that Jabarian made false statements that Derderian misappropriated funds from the Armenian genocide settlement fund (statements 2 and 3) and granting the special motion to strike all other alleged defamatory statements.  The parties are to bear their own costs on appeal.


FEUER, J.

We concur:


SEGAL, Acting P. J.


GIZA, J.*

---

\*     Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.